**Bertha PHELPS, Appellee,**

v.

**The MAGNAVOX COMPANY OF TENNESSEE and Johnson City Power Board, Appellants.**

Court of Appeals of Tennessee, Western Section.*

Oct. 17, 1972.

---

* " No Petition for Certiorari was filed in the Supreme Court; however, the Presiding Judge and a committee of members of the Court of Appeals determined that this opinion should be published."

S. J. Milligan, Greeneville, and Alfred W. Taylor, Johnson City, for appellant, Magnavox Co. of Tennessee.

Walter L. Price, Johnson City, and Ernest F. Smith, Kingsport, for appellant, Johnson City Power Board.

Todd & Dossett, Kingsport, for appellee.

NEARN, Judge.

This is the second time that this case has reached the Court of Appeals. On the first appeal, the Trial Judge's action in directing a verdict for the defendants at the close of plaintiff's proof was reversed by the Court of Appeals and a new trial ordered. Certiorari was denied by the Supreme Court and the opinion of this Court on that appeal is reported as Phelps v. Magnavox Company of Tennessee, Inc., et al. (1970 E.S.), Tenn.App., 466 S.W.2d 226.

The pleadings alone in this case constitute some one hundred-forty pages of the record and the case at one time or another involved other defendants. However, we do not intend to review all the pleadings in this opinion. For our purposes, suffice it to say that the issues were tried with Bertha Phelps, widow of William Martin Phelps as plaintiff, and The Magnavox Company of Tennessee, Inc. and Johnson City Power Board as the defendants. The defendants will be referred to in this opinion as Magnavox and the Power Board.

William Martin Phelps suffered death by electrocution on February 1, 1967, while employed as a roofer for Industrial Deck-

ing and Roofing Company of Bristol, Virginia. Industrial was the subcontractor of the prime contractor Boles & Hite Construction Company. Magnavox had contracted with Boles & Hite for the construction of a dry kiln and a building housing same. Magnavox maintains a large manufacturing plant in Johnson City, Tennessee and the new construction was a separate addition to the existing facility of Magnavox. All electrical service lines, poles and electrical transmission equipment located on the Magnavox premises were the property of Magnavox. This electrical equipment was supplied and installed by the Power Board on the basis of cost of material plus ten per cent and labor at actual cost.

On November 1, 1966, prior to the construction of the new addition but in contemplation thereof, Magnavox requested the Power Board to relocate within the Magnavox premises, one utility pole and its lines in order that they would clear the proposed addition. The relocated lines were three-phase and between phase carried approximately 12,500 volts. It was from the relocated lines that Phelps received a fatal shock.

Plaintiff's two count declaration sets out the relationship of the parties and charges both defendants with gross negligence in the failure to exercise their common law duty and the violation of certain city ordinances and applicable electrical codes.

The defendants denied all negligence and averred contributory negligence on the part of the deceased as the proximate cause of his death and therefore a bar to recovery.

On the second trial of the case, the matter was permitted to go to the jury and that body returned a verdict in favor of the plaintiff against both defendants in the amount of $130,000.00. It is from that judgment that appeal has been now perfected to this Court.

Counsel for Magnavox has made seven Assignments of Error in this Court and

counsel for the Power Board has made eight. Because of the nature of the case and the proof adduced, on appeal, both defendants find themselves more or less occupying the same boat and although different verbiage is used by respective counsels in making their Assignments of Error, their complaints fairly well follow the same pattern. Also, the number of Assignments of Error is not particularly significant, as some are simply additional reasons by the writer why a previous Assignment of Error should be sustained. Therefore, we will regulate all the Assignments of Error into four issues. These issues are:

I

Did the Trial Court err in refusing to permit the defendants to show the fact of the remarriage of Bertha Phelps to the Jury?

II

As to the defendant Magnavox, did the Trial Court err in allowing the discovery deposition of Myron L. Newton to be read into evidence?

III

Did the Trial Court err in failing to direct a verdict for the defendants at the close of all the proof?

IV

Is the verdict excessive and did the Trial Judge approve it?

It is not disputed that the plaintiff was the wife of the deceased at the time of his death, but, prior to trial the defendant moved the Court to require the plaintiff to amend her pleadings to show that the plaintiff had remarried and that her present name was Bertha Rasnick. The plaintiff countered with a motion for an order restraining defense counsel from in any way referring to the fact that plaintiff

had remarried since the first trial on the grounds that the fact of remarriage is not material or relevant to the issues. The Trial Judge overruled the defendant's motion, sustained the plaintiff's motion and ordered that defense counsel be restrained from in any way referring to the fact of plaintiff's remarriage. This act of the Trial Judge is alleged to be error by both defendants and is the basis of the first issue.

■ In a suit for wrongful death, the recovery sought is for the pecuniary value of the life of the deceased *at the time of death*. There can be no recovery for the mental suffering occasioned by the widow of the deceased. The action is the deceased's for his death. Because he is unable to speak for himself, by statute his right survives for the presentation by another. No new right is created in the wife. She simply acts in his stead. The fact of her remarriage has no bearing on her husband's death or the responsibility therefor. Memphis Street Railway Company v. Cooper (1958), 203 Tenn. 425, 313 S.W.2d 444.

It is argued that in this case the proper procedure would have been for the Trial Judge to direct the plaintiff to reveal her married name when on oath as a witnss rather than permit her to be identified as "Mrs. Bertha Phelps", and then, the Court in its charge to the jury, instruct them that they were not to consider such fact in any deliberation on the amount of damages or liability. We are unable to perceive the logic behind admitting into evidence that which is not germane to the issue in order that the jury can be instructed not to consider it. See Lancaster v. Arendell (1871), 49 Tenn. 434.

It is also argued the Court's admonitions to a jury in its charge, that they must not engage in sympathy often falls on deaf ears when a "widow" is the plaintiff. Therefore, defendants should have been permitted to prove that she was not at the time of trial a widow.

This argument presupposes that a jury will violate its oath and not follow the instructions of the Court when the interests of a widow are involved. We can make no such presupposition or assumption. The presumption is to the contrary. If that which is not germane to the issues is to be allowed in evidence on the assumption that the jury will not follow the instructions of the Court, then, the rules of evidence would be jettisoned beyond all recall. In Memphis St. Ry. Co. v. Cooper, supra, the truth of this fact was observed when the Court copied with approval from counsel's brief as follows:

> "There are certain conclusive presumptions that must be indulged in if there is to be a government under law and the fact that some of those presumptions are generally known to be fictional does not lessen the necessity of their observance and conclusive acceptance. Once we admit that a widow has a better chance of establishing liability than a more remote relative, we admit the possibility that a pretty woman is a more favored litigant than one who is homely, or that a preacher is a more favored suitor than a gambler, and so on *ad infinitum*. No matter how persuasive these ideas may be to laymen, and no matter how much lawyers may be convinced of their factual correctness in individual cases, to base a judicial decision upon such consideration is to move from the realm of law into chaos."

The majority of American jurisdictions which have considered this question have held that the remarriage of a surviving spouse does not affect the damages recoverable and that evidence of such remarriage is inadmissible. See annotations found on the subject in 87 A.L.R.2d 252 and at page 163 of the Later Case Service. It would seem that only the British Commonwealth, Australia and two of our states have held to the contrary. At one time the State of Michigan held to the minority view. See Sipes v. Michigan C. R. Co. (1925), 231 Mich. 404, 204 N.W. 84. How-

ever, in Bunda v. Hardwick, 376 Mich. 640, 138 N.W.2d 305, the Michigan Court expressly overruled their previous stand on the question and adopted the majority rule. We are of the opinion that the majority rule is the better rule, not because the majority of states have adopted it, but because it is the more reasonable rule. First, the cause of action arises at the time of death and damages are determinable as of that time. Second, the only reason that the fact of remarriage could be introduced would be to mitigate the widow's damages and she has none in this case. It is the pecuniary value of the life of the deceased, had he lived, that is to be determined. Further, we see no reason why a defendant should profit from the remarriage of a widow any more than he should profit from what she might receive from policies of insurance on his life.

We are of the further opinion that this State has long followed the majority rule, at least since Memphis St. Ry. Co. v. Cooper, supra. Why this fact has escaped the attention of various annotators on the subject, in view of the reported *Memphis St. Ry. Co.* case, we are at a loss to explain. We hold that Tennessee has and does follow the majority rule. All Assignments of Error addressed to the first issue are respectfully overruled.

■ A determination of the second issue requires a construction of T.C.A. 24–1208, a portion of which is as follows:

*Use of deposition as evidence.* At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof, in accordance with any one (1) of the following provisions:

(a) * * *

(b) The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent of a public or private corporation, partnership, or association which is a party may be used by an adverse party for any purpose.

■ Prior to trial, the attorney for the plaintiff requested Magnavox to present for discovery, witnesses who had knowledge of the facts of the case. Magnavox furnished Albert J. Marineau, Plant Manager and Myron L. Newton who held the title, Chief Industrial Engineer. The depositions were taken by agreement and without the issuance of formal notice. At the time for trial, the attorney for plaintiff sought to have the deposition of Myron L. Newton read to the jury as part of plaintiff's proof in chief. The attorney for Magnavox objected on the grounds that Newton is not a "managing agent" within the meaning of the discovery statute. The objection was overruled by the Trial Judge and the deposition was read. Counsel for Magnavox, on appeal, makes the same argument that was made below regarding the introduction of the deposition. In effect, counsel for Magnavox seeks a strict construction of the act. We are of the opinion that it should not be strictly construed, but should be fairly construed.

■ Albert J. Marineau, the admitted "managing agent" of Magnavox on his discovery deposition answered as follows:

Q. But the man who was in charge of the physical plant and its conditions, to include dangerous situations and the remedy of the same in February 1967, would have been Mr. Newton?

A. Yes.

We choose to define a managing agent as one who acts in a managerial capacity. Further, we hold that it is possible for a corporation to have more than one managing agent, just as it may have more than one officer or more than one director. Mr. Marineau described Newton as one

"who was in charge of the physical plant and its condition". To this Court that means "managing agent".

█ There is yet another reason why the deposition of Newton should be admitted. It seems that no one knew just where Mr. Newton was at the time of trial. Counsel for plaintiff stated to the Trial Judge that he had been unable to locate Newton and had been advised that he was no longer in Johnson City. Counsel for Magnavox stated that he didn't know where Mr. Newton was. The record is blank as to whether Mr. Newton is still employed by Magnavox. Subsection (c) of T.C.A. 24–1208 provides that the deposition of a witness may be used when "such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court". We think the Trial Judge summed it all up nicely when, in overruling the objection, he stated: "—this day of surprising people is over in civil court just as it is over in criminal court too."

The Assignment of Error directed to the second issue is overruled.

█ In order for the appellants to prevail on the third issue, the proof must be such so that it can be said that there is no evidence in the entire record from which a jury could base a verdict in favor of the plaintiff against the defendants. Therefore, we must review all of the proof, but the manner of this review has been clearly set out in D. M. Rose & Co. v. Snyder (1947), 185 Tenn. 499, 206 S.W.2d 897, as follows:

" * * * such review is not to determine where the truth lies or to find the facts, that not being our province in jury cases. It is only to determine whether there was any substantial evidence to support the verdict; and it must be governed by the rule, safeguarding the constitutional right of trial by jury, which requires us to take the strongest legitimate view of all the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all reasonable inferences to sustain the verdict."

Such review reveals that Bertha Phelps was married to the deceased at the time of his death. Phelps was earning $1.75 per hour at the time of his death. Bertha Phelps had four children by a previous marriage, but none by Phelps. Over three years after Phelps met his death, Bertha Phelps married a man named Rasnick who was her husband at the time of trial.

On the day before the fatal accident, while Phelps was working on the roof of the Magnavox addition, Phelps' foreman came in contact with the same wires that caused Phelps' death. The foreman was more fortunate than Phelps inasmuch as the foreman's contact with the wires resulted only in his being knocked to his knees and rendered senseless for a short period of time. Phelps was a witness to this event. The wires in question cross a corner of the addition and are about sixty-eight inches above the roof where the work took place. The day following the foreman's contact with the wires, Phelps made it known that he did not wish to work on the roof. After some discussion about the matter with his foreman, Phelps did agree to work on the roof. The foreman cautioned him to be careful of the wires.

No one actually saw Phelps come in contact with the wires. Immediately before his death, Phelps was seen by a fellow workman attempting to insert a six-foot aluminum handle into a roofing mop which was to be used to spread the roofing tar. A fellow workman who had his back to Phelps felt an electrical shock in his feet and heard the sound of discharging electricity. When he looked around, he observed Phelps lying on his back on the roof under the wires. The proof indicates that Phelps was killed instantly. The mop handle which was not introduced at the

first trial, was introduced at the second trial and bears evidence of burn marks as if it had come in contact with an electrical wire. With the exception of the introduction of the mop handle in the second trial, the evidence adduced at both trials concerning the details of the actual fatal injury does not appear to materially differ.

Counsel for the Power Board has inferred that had the introduction of the mop handle been accomplished at the first trial, the result of the first appeal would have been different, for Judge Parrott, speaking for the Court in the first opinion, commented: "There is no direct evidence as to whether the mop handle actually came in contact with the electric wires—".

█ At this juncture, we think it proper that the effect of the first ruling by this Court on this appeal be now determined. We think it matters not a whit in this case whether Phelps' hair, arms, back, head or the mop handle, while in his hands, came in contact with the wires. The point made by Judge Parrott in the previous opinion is contained in the phrase following the statement regarding the lack of direct evidence of contact when he stated: "but the evidence affirmatively and conclusively shows Phelps' death resulted from an electric shock." In other words, Judge Parrott had simply stated that although the exact point of touching or manner of electrocution is not shown with mathematical certainty, the proof showed that Phelps' death resulted from electrocution, which was sufficient to prove the causal connection between the wires and the injury. We find no material difference in the proof surrounding plaintiff's physical injury as described by Judge Parrott in the opinion on the first trial and the proof on that subject adduced at the second trial. The question of the existence of Phelps' negligence as raised by the defendants must be found and determined by the proof surrounding the actual injury for there is no other proof on this question. This being true, the ruling of this Court in its first opinion on that issue has become the law of this case. In D. M.

Rose v. Snyder, supra, the Supreme Court, adopted with approval the opinion of the Court of Appeals in which, the Court of Appeals in discussing the effect of its first opinion on the second appeal stated:

"The evidence now is not materially different on the issue of negligence. The evidence for plaintiff is practically the same, while the evidence adduced by defendant was directed to other questions than that of negligence. Such being the case, our former decision on this question is now binding upon us as the law of the case."

Therefore, so much of the arguments of counsel for appellants directed to the negligence of the plaintiff as grounds for a directed verdict are without merit for the reasons set out in the first opinion. There is no need to repeat them here.

In regard to the negligence of the defendants there is proof in the record that Magnavox owned the lines in question. Magnavox ordered the relocation of the lines by the Power Board. The Power Board relocated the lines as requested before the new addition was built. The power Board knew of the purpose of the relocation, that is, so the lines would clear the proposed addition. The Power Board relocated the lines without making any inquiry as to the length, breadth or height of the proposed addition. Both defendants had knowledge that a building was being constructed and that of necessity workmen would be working in the vicinity of the lines. Neither defendants sought or suggested that the current be cut off during the construction. The result was that the hot lines, in relation to the new addition, were in violation of national electrical codes in that the lines cleared the addition at substantially less than the required height. It is evident, if not admitted, that the lines were so close to the roof of the new addition to be in violation of applicable codes. During the trial, each defendant sought to point the finger of fault at the other for the existence of this condition.

In our opinion, both defendants in this case could be considered suppliers of electricity. There is ample evidence in this record of negligence on the part of a supplier of electricity and such negligence could be considered by a jury to be gross in view of the high standard of care required of a supplier of electricity. Suppliers of electricity are burdened with the requirement that they exercise the highest degree of care which skill and foresight can obtain. International Harvester v. Sartain (1948 W.S.) 32 Tenn.App. 425, 222 S.W.2d 854.

An act done by one charged with an ordinary degree of care might be only simple negligence, but when done by one dealing in a dangerous, lethal instrumentality, that same act could constitute gross negligence. Magnavox actually owns the lines, poles etc. that transport the 12,500 volts of electricity. Magnavox ordered the relocation of the poles and wires in order to clear the new structure. The poles were under the control of Magnavox. The power Board contracted with Magnavox to relocate the poles and the lines pursuant to the instructions of Magnavox and did relocate them without ascertaining the height of the new structure which the Power Board knew was to be constructed under the wires. Magnavox was the owner and supplier of its own electrical transmission system on its premises and it owed the duty as a supplier of electricity to exercise the highest degree of care in their construction. This burden of the highest degree of care, once existent cannot be placed by one on another's back to the complete relief of the supplier.

The Power Board holds itself out as a supplier of electricity and skilled in the installation of electrical systems. The mere fact that it is performing a task for another supplier of electricity does not relieve it of the duty to exercise that highest degree of care required of it as a supplier of electricity. As suppliers of electricity the jury could have and evidently did find that both defendants acted in such negligent manner in the performance of the duty owed to the plaintiff, that their concurring negligence was the proximate cause of his death.

Counsel for appellants also argue as additional grounds for a directed verdict, that the prime contractor, Boles & Hite and/or the subcontractor, Industrial, violated applicable electrical safety statutes in that they permitted work to be performed within six feet of high voltage lines, and that such violation constituted an independent, intervening and efficient cause of the accident. This argument has been answered in the preceding paragraphs. As suppliers of electricty neither defendant can shift its burden to another. International v. Sartain, supra.

All Assignments of Error directed to the third issue are overruled.

The last issue brings into focus the amount of the verdict. It is the position of the appellants that the amount of the award, that is, $130,000.00 is so excessive to evince passion or caprice on the part of the jury. It is further contended by the appellants that the verdict was not really approved by the Trial Judge as some of the Trial Court's remarks could be construed as a hesitance to approve or an expression of dissatisfaction with the verdict.

We find no merit in the argument of counsel that the Trial Court did not effectively approve the verdict. The remarks of the Trial Judge relied upon by counsel for appellants were made at the time the motions for a new trial were heard, but do not address themselves to the approval or disapproval of the verdict. They are remarks between Court and counsel concerning the opinion of this Court rendered in the first trial. It is true that the Trial Judge did express some honest disagreement with this Court's first opinion on a point of law. But what does that matter? He did follow that opinion as he understood it, even though he may not have been

in total agreement with this Court. That is his duty, just as it is ours to follow the directives of the Supreme Court. The writer of this opinion, having had some experience at the trial level, certainly finds nothing novel or earthshaking about a Trial Judge being in honest disagreement with an Appellate Court on a point of law. We are of the opinion that the expression of that difference of opinion by the Trial Judge on a motion for a new trial is not an expression of a disapproval of a jury verdict. In overruling the motion for a new trial the Court stated that insofar as the amount of the verdict was concerned, such verdict was not excessive or speculative and closed with the statement: "The Court approves the verdict and will overrule both of your motions, gentlemen." We hold that the Trial Judge did clearly approve the verdict.

A verdict approved by the Trial Judge is entitled to great weight on appeal. Nash-Wilson Funeral Home, Inc. v. Greer (1966 E.S.), 57 Tenn.App. 191, 417 S.W.2d 562; D. M. Rose v. Snyder, supra. Such verdict should not be disturbed on appeal unless there is no material evidence to support the award or it is so excessive as to indicate passion, prejudice and caprice on the part of the jury or the verdict is so far beyond reason that to let it stand would be palpable injustice. McCullough v. Johnson Freight Lines (1957), 202 Tenn. 596, 308 S.W.2d 387; Finks v. Gillum (1954 M.S.), 38 Tenn.App. 304, 273 S.W.2d 722; City of Columbia v. Lentz (1955 M.S.), 39 Tenn.App. 350, 282 S.W.2d 787.

The fixing of the amount of damages in a personal injury or death case is a matter peculiarly befitting a jury. It requires no legal acumen, but does require the application of common knowledge, common experience and common understanding to the situation. There is no certain yardstick or guide by which damages in such a case may be reached or reviewed. Unlike the case of damages to a chattel, there is no market place to go to where such things are bought and sold and their value can be reliably ascertained. There is no marketplace simply because there are no buyers for the human miseries of pain, suffering and death. What are the proper measures of damages in this case? In other words, what is it worth to the deceased to be removed from this life at the age of twenty-five, in the prime of his manhood. It is not an easy question to answer. One hundred-thirty thousand dollars ($130,000.00) was the answer of the jury. In our examination of the record, we find that testimony was adduced to the effect that the deceased had a life expectancy of 45.28 years with a life work expectancy of 36.68 years. Further, there is testimony that had the deceased continued to work during his life work-expectancy with no increase in hourly wages whatsoever, he would have earned at least $126,000.00 during that period. Therefore, there is evidence to sustain the amount of the verdict and reversal cannot be had on that ground.

We admit that one hundred-thirty thousand dollars ($130,000.00) is a substantial verdict. However, we do not find that amount in a death case to be so excessive to warrant a finding of passion, prejudice or caprice on the part of the jury. Especially so when the Trial Judge approved that amount. Next to the jury, the Trial Judge is the most competent person to pass on the excessiveness of a verdict. Southeastern Aviation, Inc. v. Hurd (1962), 209 Tenn. 639, 355 S.W.2d 436. It is not for the members of this Court to say what we would have awarded. Suffice it to say that we have reviewed the facts as shown by the record and the award of the jury does not shock the conscience of this Court. To let it stand would not, in our opinion, work palpable injustice. All Assignments of Error directed to the last issue are overruled.

It therefore results that all Assignments of Error are overruled and the judgment of the lower Court is affirmed. Cost of

appeal is taxed equally between the appellants and the sureties on their respective bonds.

CARNEY, P. J., and MATHERNE, J., concur.