**SUMMIT HILL ASSOCIATES,**
**Plaintiff-Appellant,**

v.

**KNOXVILLE UTILITIES BOARD,**
**Defendant-Appellee.**

Court of Appeals of Tennessee,
Western Section, at Knoxville.

Dec. 28, 1983.

Application for Permission to Appeal
Denied by Supreme Court
March 19, 1984.

92

John O. Threadgill and James C. Wright of Butler, Vines, Babb & Threadgill, Knoxville, for plaintiff-appellant.

Robert R. Campbell of Hodges, Doughty & Carson, Knoxville, for defendant-appellee.

TOMLIN, Judge.

The plaintiff has appealed from a judgment entered in the Circuit Court of Knox County, sitting without a jury, in favor of the defendant. The plaintiff seeks compensation for damages sustained by it when its construction site was flooded with water, resulting from a break in an underground water main which was located in one of the public streets in Knoxville and operated by the defendant as part of the water system of the City of Knoxville. The plaintiff's appeal presents four issues for us to review: (1) the failure of the trial court to apply the doctrine of strict liability; (2) the failure of the trial court to apply the doctrine of res ipsa loquitur; (3) the failure of the trial court to hold the defendant to a high degree of care commensurate with the risk involved; and (4) whether or not the evidence preponderates against the judgment of the court. We are of the opinion that the trial judge properly applied the law of this state, and that the evidence does not preponderate against his decision.

The facts material to this litigation are as follows: The plaintiff, a partnership, had contracted for the construction of a multi-story Quality Inn in downtown Knoxville. The construction site covered most of a square block, and was located on the south side of Vine Avenue. Construction began in July, 1980.

In the early morning hours of December 1, 1980, an eight-inch cast iron water main running in an east-west direction between Gay Street and South Broadway, and located under Vine Avenue, ruptured. This pipe had been installed in 1894 or 1895. At the time of the rupture the ground level of the hotel project was well below the elevation of Vine Avenue and the property adjacent to the project on the west. The point of the rupture under Vine Avenue was just west of a point opposite the center of the hotel tower. The entire construction site was flooded to an approximate depth of two to three feet. At the time of the water main rupture, and for some period of time prior thereto, the block of Vine Avenue which adjoined the north side of the construction project was closed to traffic by means of a fence. This section of the street was used for the parking of trailers that served as temporary job offices.

In the early morning of December 1, 1980, the maintenance foreman was notified by telephone from the pumping station of the water department that there had been a sudden drop in pressure. A maintenance crew immediately began touring the downtown area of the city looking for a rupture of some type. At 4:20 a.m., the maintenance crew received a call from the Knoxville Police Department, reporting a large water leak near the intersection of Vine Avenue and Gay Street. The maintenance crew immediately went to the scene, and upon observing the discharge of water,

shut off the valves controlling the supply of water to that section of the water main.

The water department's records indicate that the section of the main containing the rupture was "valved off" at 4:35 a.m. This time was controverted by the plaintiff's construction foreman, who testified that the water was shut off closer to 5:00 a.m. The section of the main where the rupture was located was in that part of Vine Street that was fenced off. After the water was valved off, the maintenance crew dug up the street, cut the line, and plugged it on both ends so that service could be restored.

Insofar as damages are concerned, not only did the water have to be pumped out, but also, sink holes formed at the construction site, certain foundations had to be reinforced and reconstructed, and some of the retaining walls shoring up the ground around the construction site were washed down and had to be replaced. The opening of the hotel was thus delayed beyond its target date. The plaintiff contended that a substantial portion of this delay was caused by the flooding of the construction site.

## I. STRICT LIABILITY.

■ The first issue we address is to the effect that the trial court should have applied the doctrine of strict liability to the facts of the case at bar. Simply stated, this means that once the plaintiff proved causation, then without the showing of any negligence on the part of the defendant, it would be held liable for all damages naturally and reasonably ensuing from the proven cause.

The doctrine of strict liability stems from the landmark English case of *Rylands v. Fletcher*, L.R. 3 H.L. 330, 1 E.R.C. 257 (1868). In support of its insistence that the trial court (and this Court) should apply the doctrine of strict liability, the plaintiff cites cases from several jurisdictions that have applied this doctrine to suits for damages resulting from ruptured water lines. Our research indicates that these jurisdictions are in the distinct minority. The cases cited are *Lubin v. Iowa City*, 257 Iowa 383,

131 N.W.2d 765 (1964), which relied upon an earlier case styled *Bridgeman-Russell Company v. City of Duluth*, 158 Minn. 509, 197 N.W. 971 (1924); *Smith v. City of Morgantown*, 289 S.E.2d 223 (W.Va.1982); *Bierman v. City of New York*, 60 Misc.2d 497, 302 N.Y.S.2d 696 (Civ.Ct.N.Y.1969); and *Smith v. Town of Logansport*, 395 So.2d 888 (La.App.1981), which was decided on the basis of a Louisiana statute.

On the other hand, the general rule in this country is stated in the beginning of a very thorough annotation on this subject, found in 20 A.L.R.3d 1294, 1301:

*[a] In general*

The liability of a water company for damages arising from the operation of a waterworks is generally determined by the rules governing liability for negligence. It has accordingly been held (or tacitly assumed) in the majority of the cases involving the escape of water from a main that the water distributor is not an insurer and that a showing of negligence on its part is a necessary prerequisite to recovery.

In 78 *Am.Jur.* 2d, Water Works and Water Companies, § 62 (1975), beginning at page 951, the general rule is stated as follows:

*§ 62 Injuries caused by water escaping from mains.*

. . . .

With regard to the liability of a water distributor for damage caused by water escaping from a main, it has been held or tacitly assumed in the majority of cases considering such liability that the water distributor is not an insurer and that a showing of negligence on its part is a necessary prerequisite to recovery.

Writing as to the extent to which the American courts have applied the principles laid down in the English case of *Rylands v. Fletcher*, Dean Prosser, in his *Law of Torts* 4th Ed. (1971), states at pages 510 through 512 that:

On the other hand, the conditions and activities to which the American courts have refused to apply Rylands v. Fletch-

er, whether they purport to accept or to reject the case in principle, have been with few exceptions what the English courts would regard as "natural" use of land, and not within the rule at all. They include water in household pipes, the tank of a humidity system, or authorized utility mains; ... The conclusion is, in short, that the American decisions, like the English ones, have applied the principle of Rylands v. Fletcher only to the thing out of place, the abnormally dangerous condition or activity which is not a "natural" one where it is.

The grounds on which other states have rejected the applicability of the doctrine of strict liability to water systems are enlightening. In *Interstate Sash & Door Company v. City of Cleveland*, 148 Ohio St. 325, 74 N.E.2d 239 (1947), the Ohio Supreme Court said that "[T]he laying of mains in public streets for the purpose of furnishing water for protection against fire and for use of inhabitants is universally recognized as proper, necessary and legal in modern cities." *Id.* 74 N.E.2d at 241.

The Supreme Court of South Dakota, when it rejected the applicability of the doctrine of strict liability in cases similar to the one *sub judice* in *Midwest Oil Company v. City of Aberdeen*, 69 S.D. 343, 10 N.W.2d 701 (1943), said:

> The present facts disclose water being sent through a ten-inch main in the manner now generally accepted for the purpose of furnishing a water supply to city dwellers. We think it clear that such a distribution of water does not constitute an ultra-hazardous activity .... Water mains are universally in use in cities, and to hold that a proper and reasonable use of such mains "necessarily involves a risk of serious harm to the person, land or chattels of others" would be contrary to the experience of at least several generations.

*Id.* 10 N.W.2d at 702–3.

The Washington Supreme Court in *Pacific Northwest Bell Telephone Company v. Port of Seattle*, 80 Wash.2d 59, 491 P.2d 1037 (1971), and the Oregon Court of Appeals in *McDaid v. City of Pendleton*, 4 Or.App. 380, 478 P.2d 642 (1970), both found that the maintenance of a pressurized water main by the defendant municipality was not an abnormally dangerous activity, the Oregon court stating that, "There is nothing 'extraordinary,' 'exceptional,' or 'unusual' about such activity." *Id.* 478 P.2d at 643.

We are told by counsel that this case is one of first impression in Tennessee. After considering both alternatives we are of the opinion that the rationale of those states rejecting the applicability of the doctrine of strict liability is much more reasonable and logical than those few states applying it to ruptured water mains. Accordingly, we join with the trial court in rejecting the doctrine. Our decision to do so is bolstered by the fact that on two previous occasions, in *Nashville Gas & Heating Company v. Phillips*, 17 Tenn.App. 648, 69 S.W.2d 914 (1933), *cert. denied* (1934), and *Gross v. Nashville Gas Company*, 608 S.W.2d 860 (Tenn.App.1980), *cert. denied* (1980), this Court has declined to apply the doctrine of strict liability to gas suppliers, notwithstanding the fact that gas is both poisonous and dangerous, as well as being highly explosive.

## II. RES IPSA LOQUITUR.

The plaintiff concludes its section of argument in its brief advocating the applicability of the doctrine of res ipsa loquitur by stating that:

> The trial court should have determined that res ipsa loquitur created reasonable evidence that the defendant had not acted with due care and that plaintiff had brought forward evidence negating other causes and therefore should have found for the plaintiff.

■ As we understand the application of the doctrine of res ipsa loquitur, once applied, it does not guarantee or assure a verdict for the plaintiff. As applied in this state, it appears to us that the doctrine is but one form of circumstantial evidence from which the trier of fact may infer negligence. The trier of fact is permitted,

and not compelled, to draw the inference of negligence.

When the doctrine is applied, while it relieves the plaintiff from proving the defendant guilty of specific negligence, it does not relieve the plaintiff of the responsibility of proving the defendant at fault, and the inference can be rebutted by proof that the defendant had exercised reasonable care under the circumstances.

The plaintiff states that there are no reported Tennessee cases approving the application of res ipsa loquitur to water main cases. Under the facts as presented, we do not find it necessary to pass upon the question as to whether it should or should not be applied. If the trial court did consider it, he disposed of it, in our opinion, by finding first of all that the occurrence had not been proven to be one that would not have occurred in the absence of negligence on the part of the defendant, noting that the plaintiff came forward with expert proof to the effect that the cause was a defective section of pipe. The court also found that "it has not been shown to the satisfaction of the Court that the defendant was guilty of any negligence in the operation of this line. I can't find that they did anything that wasn't in the exercise of due care."

In other words, the court found that one of the elements of res ipsa was absent. Furthermore, irrespective of the fact that he eliminated one of the three elements, the trial judge, as the fact finder, found from the proof that the defendant had exercised ordinary care in connection with the water main. In other words, the plaintiff was not entitled to the inference of res ipsa loquitur because an element was missing, and if it had been so entitled, the trier of facts found that the inference was overcome by the defendant's proof. From our examination of the record, we cannot say that the trial judge erred.

## III. THE HIGHEST DEGREE OF CARE.

The plaintiff also takes the position that the Court should hold the defendant to the highest degree of care in connection with the maintenance of its water mains. For this proposition it relies upon *Phelps v. The Magnavox Company of Tennessee*, 497 S.W.2d 898 (Tenn.App.1972), an opinion authored by Judge Nearn of this Court, which held that a supplier of electricity, considered to be a dangerous, lethal instrumentality, was burdened with the requirement that it "exercise the highest degree of care which skill and foresight can obtain." *Id.* at 906. In *Gross v. Nashville Gas Company, supra*, while affirming that the doctrine of strict liability did not apply to suppliers of gas, the Court did hold that a supplier of gas was "liable only for failure to exercise the high degree of care commensurate with the danger of its product." 608 S.W.2d at 872.

We do not think these cases are analogous to the case *sub judice*. While electricity is clearly a "dangerous, lethal instrumentality," and gas is inherently poisonous and explosive, water is neither. It is a common place part of our every day life. We drink it, we use it to cultivate our crops, we wash our clothes and dishes in it, we bathe in it, and it is a source of life for most of the food we eat and the vegetation we enjoy. The contention that the trial court erred in not holding the defendant to the highest degree of care is thus without merit.

## IV. THE PREPONDERANCE OF EVIDENCE.

Having established that the trial court was correct in applying the standard of ordinary negligence in the trial of this case, it now becomes our responsibility to consider his judgment in the light of the evidence introduced at trial. This being a non-jury case, our scope of review is *de novo* upon the record in the trial court, and the findings of the trial judge are presumed to be correct and must be affirmed by us, unless we find the preponderance of the evidence to be otherwise, absent error of law. Rule 13(d), Tennessee Rules of Appellate Procedure.

Much of the evidence offered was conflicting. The plaintiff offered proof to the effect that the defendant's records were inadequate for it to properly monitor the history of ruptures and leaks in its lines. On the other hand, the defendant offered expert proof to the effect that its record-keeping system was more than adequate. The plaintiff offered an expert witness who testified that the pipe had been leaking for months. The defendant offered an expert who countered by testifying that the leak likely developed overnight. The court noted in this regard that with the plaintiff's excavation being so close in proximity to the site of the leak, had it developed months earlier, it surely would have been detected in the plaintiff's construction site before the morning of December 1, 1980.

■ The construction foreman on the plaintiff's project testified that the leak was not valved off until some 25 minutes later than testified to by the defendant, whose witnesses testified from logs kept by the maintenance department. The plaintiff's witnesses testified that the inspection procedure of the defendant was not adequate, while the defendant's witnesses, including experts, testified that it was adequate. On the question of inspection, the defendant also relied on Tennessee Code Annotated § 29–20–205 of the Governmental Tort Liability Act, under which this action was brought, and which contains an express retention of immunity as to a governmental entity's failure to either inspect or to make an inadequate inspection. We are of the opinion that this reliance was well taken.

■ The trial judge heard all the witnesses testify and noted their manner and demeanor on the witness stand. Inasmuch as this case was tried absent a jury, it was up to the trial judge to decide which witness he believed and which one he did not believe, and to decide the weight and effect that he was going to give to the testimony of each of them. Where cases are tried upon oral testimony without the intervention of a jury, the trial judge's findings of fact, dependent upon the credibility of the

witnesses, are entitled to great weight in the appellate court and will not be reversed on appeal unless there is clear, concrete, and convincing non-oral evidence to the contrary. *Tennessee Valley Kaolin Corporation v. Perry,* 526 S.W.2d 488, 490 (Tenn.App.1974).

Having disposed of the issues presented by this appeal, we affirm the judgment of the trial court. Costs in this cause are taxed to the plaintiff, for which execution may issue, if necessary.

NEARN, P.J. (W.S.), and CRAWFORD, J., concur.