# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
October 26, 2012 Session

## RUTH M. MAXWELL v.
## MOTORCYCLE SAFETY FOUNDATION, INC. ET AL.

**Appeal from the Circuit Court for Rutherford County**
**No. 59231      Royce Taylor, Judge**

_____

**No. M2012-00699-COA-R3-CV - Filed January 29, 2013**

_____

Plaintiff filed this action against the instructor of a motorcycle safety course and his employer for injuries she sustained when she drove off of the designated course site and collided with a parked pickup truck. The trial court found that the plaintiff's negligence claims were barred because she signed a valid written waiver/release from liability document prior to starting the course. The trial court also dismissed the plaintiff's gross negligence claims, finding there was nothing in the record which would allow a reasonable juror to conclude the defendant exercised a conscious neglect of duty or a callous indifference to consequences. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, J.J., joined.

R. Steven Waldron, Murfreesboro, Tennessee, for the appellant, Ruth M. Maxwell.

Joel P. Surber, Frank M. Gallina, Nashville, Tennessee, for the appellees, Mid Tenn Motorcycle Education Center, and Michael Upchurch.

## OPINION

Ruth Maxwell, the plaintiff in this case, is a 58-year-old resident of Signal Mountain, Tennessee, where she works as a first grade teacher at Nolen Elementary School. In 2008, after seeing a newspaper ad for a motor scooter convention in Chattanooga, Ms. Maxwell became interested in trying what she believed would be a fun and economical way to travel to and from work. The newspaper ad suggested that new motor scooter riders first enroll in a class to learn how to operate a motor scooter safely. Ms. Maxwell brought the idea up to her friend, Paul Girata, and he agreed to take a course with her.

Ms. Maxwell entrusted Mr. Girata to select the course without her input and make the arrangements for them to attend. Mr. Girata, a resident of Winchester, Tennessee, contacted Mid Tenn Motorcycle Education Center, Inc. ("MTMEC"), to enroll Ms. Maxwell and himself in a motorcycle safety course in Murfreesboro. He selected the "Learn to Ride – Basic Rider Course," a three-day beginner level course scheduled to take place August 8 through August 10, 2008. The course has a $205 fee and is designed to teach novice riders risk awareness and street skills on a motorcycle. Although the course is not required to obtain a motorcycle endorsement on a driver's license, upon proof of completion of the course, the Tennessee Department of Motor Vehicles waives the written and riding exams ordinarily required for the endorsement.

The instructor for the course, Michael Upchurch, is a "Rider Coach" certified by the Motorcycle Safety Foundation, Inc. ("MSF"). The first day of the course took place at Sloan's Motorcycle Dealership. Before the course began, each of the participants was required to read and sign a "Waiver of Release of Liability" agreement ("the Waiver"). The Waiver stated:

<u>READ CAREFULLY</u>
<u>WAIVER OF RELEASE OF LIABILITY</u>

In Consideration of MID TENN MOTORCYCLE EDUCATION CENTER furnishing service and/or equipment to enable me to participate in the Motorcycle Rider Education Class, I agree as follows:

I fully understand and acknowledge that: (a) risks and dangers exist in my use of motorcycles and motorcycle equipment and my participation in the Motorcycle Rider Education Class activities; (b) my participation in such activities and/or use of such equipment may result in injury or illness include, but not limited to bodily injury, disease, strains, fracture, partial and/or total paralysis, death or other ailments that could cause serious disability; (c) these risks and dangers may be caused by the negligence of the owners, employees, officers or agents of MID TENN MOTORCYCLE EDUCATION CENTER, the negligence of the participants, the negligence of others, accidents, breaches of contract, from foreseeable or unforeseeable causes; and (d) by my participation in these activities and/or use of equipment, I hereby assume all risks and dangers and all responsibility for any losses and/or damages, whether caused in whole or in part by the negligence or conduct of the owners, agents, officers, or employees of the MID TENN MOTORCYCLE EDUCATION CENTER or by any other person.

-2-

I on behalf of myself, my personal representatives and my heirs hereby voluntarily agree to release, waive, discharge, hold harmless, defendant and indemnify MID TENN MOTORCYCLE EDUCATION CENTER and its owners, agents, officers and employees from any and all claims, suits or causes of action for bodily injury, property damage, wrongful death, loss of services or otherwise which may arise out of my use of motorcycles and motorcycle equipment or my participation in the Motorcycle Rider Education Class activities. I specifically understand that I am releasing, discharging and waiving my claims of actions that I may have presently or in the future for the negligent acts or other conduct by MID TENN MOTORCYCLE EDUCATION CENTER and its owners, agents, officers or employees.

I HAVE READ THE ABOVE WAIVER OF RELEASE AND BY SIGNING IT AGREE IT IS MY INTENTION TO EXEMPT AND RELIEVE MID TENN MOTORCYCLE EDUCATION CENTER FROM LIABILITY FOR PERSONAL INJURY, PROPERTY DAMAGE OR WRONGFUL DEATH CAUSED BY NEGLIGENCE OR ANY OTHER CAUSE.

(Capitalization in original).

Ms. Maxwell read and signed the Waiver and proceeded with the course. Day One was dedicated to classroom instruction by Mr. Upchurch covering the parts of a motorcycle, appropriate safety gear, and safe riding practices. At the end of Day One, Mr. Upchurch took the class outside and physically showed them the different parts of a motorcycle, including the clutch, throttle, and brake. The participants had several opportunities to ask questions throughout the evening.

The hands-on training portion of the Basic Rider Course started the morning of the second day at the Central Middle School parking lot in Murfreesboro where Mr. Upchurch was joined by a second certified Rider Coach, Jill Flynn, to ensure sufficient supervision for the riding portions of the course. The students selected a motorcycle and helmet from MTMEC's supply and Mr. Upchurch began training the participants on basic activities, for example getting on and off the motorcycle, identifying its controls, engaging the clutch and brake, and how to "rev up" the engine. Ms. Maxwell had no trouble performing any of these tasks.

After a short break, Ms. Maxwell commenced the second set of exercises, starting with "group rocking," in which the students alternate between releasing the clutch, which engages the transmission and causes the motorcycle to roll forward, and disengaging the clutch, which causes the motorcycle to rock back to its starting point. Ms. Maxwell also

performed this exercise without difficulty. The next exercise, "power walking," was a continuation of the rocking exercise. Instead of disengaging the clutch and rocking back to the motorcycle's starting point, the students were required to keep the transmission engaged and walk across the parking lot, round a cone, and return to the starting point. Although Ms. Maxwell struggled with the weight of the motorcycle, she was able to complete this exercise. Mr. Upchurch called a break at the end of the power walking exercise, but stayed with Ms. Maxwell to give her additional instruction. He informed her of the availability of private lessons and asked her, "do you think this is your day?" She said she believed it was and she continued with the class. On her second attempt, Ms. Maxwell improved her performance and then took a break with the rest of the class.

The students next applied throttle and rode their motorcycles in an ellipse-shaped path on the course marked by cones. They were expected to complete several laps before the end of the exercise. Approximately ten to fifteen minutes into this exercise, Ms. Maxwell toppled over but was not injured. Mr. Upchurch helped her return to her feet so that she could continue with the exercise.

Ms. Maxwell's accident occurred on her second attempt at the riding exercise. After she rounded the curve of the ellipsis, Ms. Maxwell accelerated the motorcycle engine to approximately twenty miles per hour, traveled eighty yards off course, jumped a curb, then traveled another eighty yards before striking the passenger side of a parked pickup truck. Mr. Upchurch immediately ran to her assistance. Ms. Maxwell had fallen from the motorcycle and sustained serious injuries – Mr. Upchurch observed that her right leg was twisted underneath her, she had lost two teeth and was bleeding from her mouth, and she appeared to be dazed. Another student called an ambulance while Mr. Upchurch attended to Ms. Maxwell. When the ambulance arrived, Mr. Upchurch told Mr. Girata to go to the hospital with her. After the ambulance left, Mr. Upchurch prepared an incident report. He also spoke with the rest of the class about the accident. One student chose to leave, but the others remained and completed the course.

Ms. Maxwell filed suit in the Rutherford County Circuit Court on June 23, 2009, against Mr. Upchurch, MTMEC, and MSF. Ms. Maxwell alleged MTMEC and Mr. Upchurch were negligent and grossly negligent in allowing her to continue and encouraging her to complete the class after it became apparent that she was struggling and fallen during the first riding exercise. She also alleged MSF was negligent in certifying Mr. Upchurch as a Rider Coach. She sought $850,000 in damages.

Following discovery, all three defendants moved for summary judgment, asserting that Ms. Maxwell's negligence claims were barred by the Waiver she executed before the course began, and that the undisputed facts established that her gross negligence claims were

without merit. At the hearing on February 8, 2012, Ms. Maxwell did not oppose the motion as to MSF and the trial court dismissed the negligent certification claim against MSF.

As for her claims against MTMEC and Mr. Upchurch (hereafter collectively "Defendants"), Ms. Maxwell argued the Waiver was void because it was unconscionable and contrary to public policy and, therefore, it did not bar her claims of gross negligence.

The trial court found, *inter alia*, that "the terms of the [Waiver] were clearly not so unfair and oppressive that no reasonable person would find them acceptable," and furthermore that because Tennessee Department of Safety Rule 1340-1-11-.06(5)(e) requires instructors in certified Motorcycle Rider Education Programs such as MTMEC to "ensur[e] that all participants complete a release, waiver and indemnification form," the Waiver was enforceable as a matter of law. The court also found that "the material facts are not in dispute and the conclusions to be drawn from these facts would permit a reasonable person to reach but one conclusion, that the alleged acts and omissions of Defendants do not constitute gross negligence." Based upon these findings, the trial court granted Defendants' motion for summary judgment.

## ANALYSIS

When this Court reviews a grant of summary judgment, we must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of the nonmoving party, and discard all countervailing evidence. *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). Summary judgment should only be granted when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach but one conclusion. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). Because the resolution of a motion for summary judgment is a matter of law, we review the trial court's judgment de novo with no presumption of correctness. *Martin v. Norfolk Southern Ry. Co.,* 271 S.W.3d 76, 84 (Tenn. 2008).

Defendants, as the moving party, have "the ultimate burden of persuading the court that there are no genuine issues of material fact and that [they] are entitled to judgment as a matter of law." *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008). Defendants successfully shifted the burden of production by alleging undisputed facts showing the existence of an exculpatory agreement, the Waiver. Ms. Maxwell does not dispute that she read and signed the Waiver. She argues the Waiver is void as against public policy, and furthermore that it is unconscionable. Finally, she argues the trial court erred in dismissing her gross negligence claims because, she asserts, a motorcycle is a dangerous instrumentality

and because Mr. Upchurch was at least arguably grossly negligent in not forcing her to quit the class before her accident.

We will first consider whether the Waiver is valid, then we will consider whether summary judgment was appropriate as to Ms. Maxwell's claims of gross negligence.

## I. WAIVER OF ORDINARY NEGLIGENCE

It is well-settled law in Tennessee that, subject to certain exceptions, "parties may contract that one shall not be liable for his negligence to another." *Olson v. Molzen*, 558 S.W.2d 429, 430 (Tenn. 1977) (citing *Moss v. Fortune*, 340 S.W.2d 902 (Tenn. 1960)). Ms. Maxwell nevertheless takes the position that the trial court erred in enforcing the Waiver because the Waiver violates public policy due to the nature of the services provided, and furthermore because the Waiver is unconscionable.

In support of her claim that the Waiver violates the public policy of this State, Ms. Maxwell relies upon the Tennessee Supreme Court case of *Olson v. Molzen*, 588 S.W.2d 429, 430 (Tenn. 1977). In that case, the Tennessee Supreme Court recognized an exception to the general rule favoring exculpatory agreements, due to the fact that "certain relationships required greater responsibility which would render such a release 'obnoxious.'" *Henderson v. Quest Expeditions*, 174 S.W.3d 730, 732 (Tenn. Ct. App. 2005) (quoting *Olson v. Molzen*, 588 S.W.2d 429, 430 (Tenn. 1977)). The Court adopted the following six factors for courts to consider when determining whether an exculpatory agreement violates public policy:

(a.) It concerns a business of a type generally thought suitable for public regulation.

(b.) The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

(c.) The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

(d.) As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

(e.) In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

(f.) Finally, as a result of the transaction, the person or property of the purchase is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Olson*, 558 S.W.2d at 431 (citing *Tunkle v. Regents of Univ. of Cali.*, 383 P.2d 441 (Cal. 1963)).

Despite Ms. Maxwell's insistence to the contrary, the case at bar is a far cry from other cases in which the courts of this State have applied these factors to invalidate exculpatory clauses on public policy grounds. In *Olson*, for example, the Tennessee Supreme Court invalidated an exculpatory clause signed by a patient as a condition of receiving medical treatment. *Id.* In *Carey v. Merritt*, this Court invalidated an exculpation clause in a home inspector's contract, reasoning that "the purchase of a home is, perhaps, the largest investment an average person will make" and therefore, "such inspections . . . are of great importance to the public and a matter of practical necessity for most members of the public." 148 S.W.3d 912, 916 (Tenn. Ct. App. 2004).

By contrast, this Court upheld exculpatory agreements in favor of a white water rafting company noting, while commercial white water rafting is a regulated industry and thus does "affect the public interest," nevertheless, "the presence of this factor does not render this Release offensive to the public interest." *Henderson v. Quest Expeditions, Inc.*, 174 S.W.3d 730, 733 (Tenn. Ct. App. 2007). The Court in *Henderson* looked to the fact that the Tennessee Legislature expressed a "legislative intent . . . 'to encourage white water rafting by discouraging claims based on injury, death or damages resulting from risks inherent in white water rafting'" by statute. *Id.* (quoting 2005 Tenn. Pub. Acts 169). In *Tompkins v. Helton*, this Court upheld a release and waiver of liability document executed in favor of a motor speedway. No. M2002-01244-COA-R3-CV, 2003 WL 21356420, at *1 (Tenn. Ct. App. June 12, 2003). The *Tompkins* Court noted that "the facts and circumstances surrounding speedway racing may arguably establish that such a dangerous activity might generally be thought suitable for regulation," but that there was no proof "that the speedway is a matter of basic or practical necessity for some members of the public . . . . Speedway races are not an essential public service, as are medical services, housing, or construction loans." *Id.* at *4 (internal citations omitted). The *Tompkins* court further found, "the voluntary nature of attendance and the atmosphere of a recreational event at a speedway race negate a finding that the patron is placed under the control of the owner . . . ." *Id.*

Applying the foregoing to the facts of this case, we have determined that the Waiver does not violate the public policy of this State. Enrolling in the course with MTMEC is a wholly voluntary activity, akin to attending a motor speedway race or white water rafting. *See Henderson*, 174 S.W.3d at 733; *Tompkins*, 2003 WL 21356429, at *4. Ms. Maxwell was not required to take the course to obtain the appropriate endorsement on her license to drive a motorcycle; indeed, she testified that she decided to take the class because she thought it would be fun. Ms. Maxwell was also free to leave the course at any time. She understood the risks of taking the class and of riding a motorcycle, and decided to go through with it. In *Olson*, to avoid signing the exculpatory agreement, the plaintiff would have been required to turn down important medical services. *See Olson*, 588 S.W.2d at 430. In *Carey*, the plaintiff would have been forced to forego an inspection before purchasing a home. *See Carey*, 148 S.W.3d at 916. Ms. Maxwell simply was not in the same vulnerable position and was not subject to the same coercive forces.

Our conclusion is further bolstered by the fact that the Tennessee Department of Safety, Driver Control Division *requires* that participants in Motorcycle Rider Education Programs, such as MTMEC, "complete a release, waiver and indemnification form supplied by the Department." Tenn. Comp. R. & Regs. 1340-1-11-.06(5)(e). The Rule further provides that the sponsors of these programs "shall be responsible for all phases of the rider training course," including ensuring that the participants sign the Department's Waiver. *Id.*

For similar reasons, we also find the Waiver is not unconscionable. The basis for Ms. Maxwell's claim of unconscionability is the fact that she had already paid the $200 non-refundable[1] tuition before she was informed that she would be required to sign the Waiver.

As the Tennessee Supreme Court has held:

> Enforcement of a contract is generally refused on grounds of unconscionability where the "inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other."

*Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004) (quoting *Haun v. King*, 590 S.W.2d 869, 872 (Tenn. Ct. App. 1984)). The question of whether an agreement or provision thereof is unconscionable is a question of law, the determination of which "is made in light of its

---

[1] There is some question as to whether the tuition was in fact nonrefundable. However, because this case is before this Court on summary judgment, we will presume for the purposes of this appeal that the tuition was nonrefundable.

setting, purpose and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes . . . ." *Id.* at 284-85 (internal citations omitted).

Considering the facts and circumstances of this case in the light most favorable to Ms. Maxwell, we find the Waiver is not unconscionable. Ms. Maxwell admits that she read and understood the Waiver completely, and did not have any objection to it. When presented with the Waiver, she did not inquire as to whether a refund was available if she did not want to sign it, nor did any of the other participants. Furthermore, as discussed above, Ms. Maxwell was not compelled to go through with the course in order to obtain a motorcycle endorsement on her driver's license, or even to learn how to ride a motorcycle. Thus, we find the Waiver is reasonable in the circumstances of this case, where untrained riders are learning about motorcycle operation for the first time. Given the unavoidable risks in such an environment, the Waiver keeps MTMEC and other motorcycle safety organizations viable. Along this same vein, the Waiver serves to underscore to the participants that motorcycle riding is not an activity without risks, and forces the participants to take some responsibility for their own personal safety when doing so. We recognize that Ms. Maxwell would have forfeited $200 had she chosen not to go through with the class; however, this fact alone does not render the Waiver unconscionable.

For the foregoing reasons, the Waiver is valid and we affirm the decision to summarily dismiss Ms. Maxwell's negligence claims against the Defendants.

## II. GROSS NEGLIGENCE

"Parties may contract that one shall not be liable but that such other shall assume the risk incident to such negligence. However, a contract against liability will not operate to protect a party who is guilty of gross negligence." *Buckner v. Varner*, 793 S.W.2d 939, 941 (Tenn. Ct. App. 1990). "To prevail on a claim of gross negligence in Tennessee, a plaintiff must demonstrate ordinary negligence and must then prove that the defendant acted 'with utter unconcern for the safety of others, or . . . with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." *Leatherwood v. Wadley*, 121 S.W.3d 682, 693-94 (Tenn. Ct. App. 2003) (internal citations omitted).

Ms. Maxwell argues that Mr. Upchurch's conduct preceding her accident at least arguably reflected "utter unconcern" for her safety, or such a "reckless disregard" for her rights "that a conscious indifference to consequences is implied in law." *Id.* She relies on the fact that Mr. Upchurch continued to encourage her to complete the class after he observed that she was hot, dehydrated, and struggling to keep up with the other students.

We respectfully disagree. Having reviewed the evidence in the record, we have concluded the material facts are not in dispute and the conclusions to be drawn from these facts would permit a reasonable person to reach but one conclusion, that the alleged acts and omissions of Mr. Upchurch and MTMEC do not constitute gross negligence. Our conclusion is based on the fact that Ms. Maxwell was enrolled in a beginner-level course, designed for people who have no experience with motorcycles. The record shows that Mr. Upchurch paid extra attention to Ms. Maxwell; when he observed her struggling or making mistakes, he gave her specific instructions on how to correct her mistakes. The record further shows that until her accident, Ms. Maxwell was able to listen, apply Mr. Upchurch's advice, and progress through the exercises. He told her to take a break and get something to drink when he saw that she was getting too hot to properly concentrate. He told her about the option of private lessons, but encouraged her to continue trying in the group class because he observed that she had been able to correct her mistakes. Prior to her accident, Ms. Maxwell had been able to identify the clutch and the brake, and understood how to use them to control the speed and direction of the motorcycle.

This Court has previously affirmed summary judgment in favor of a motorcycle safety program and its instructor on a participant's claims for gross negligence where, "prior to her injury, the plaintiff was taught the basics of riding a motorcycle, including braking, in a classroom setting for the better part of three days. . . . The instructors demonstrated every exercise prior to the plaintiff being asked to perform the exercises, and the plaintiff was supervised at all times." *See Jones v. Tenn. Riders Instruction Program*, No. M2006-01087-COA-R3-CV, 2007 WL 393630, at *2 (Tenn. Ct. App. Feb. 5, 2007). While we note Ms. Maxwell's accident occurred on the second day of instruction, not the third, we find the reasoning in *Jones* applicable here. *Id.*

Finally, Ms. Maxwell asserts that a motorcycle is a dangerous instrumentality, which would elevate an act of ordinary negligence to an act of gross negligence. *See Phelps v. Magnavox Co. of Tenn.*, 497 S.W.2d 898, 906 (Tenn. Ct. App. 1972) ("An act done by one charged with an ordinary degree of care might be only simple negligence, but when done by one dealing in a dangerous, lethal instrumentality, that same act could constitute gross negligence."). Again, we respectfully disagree.

Our Supreme Court has long held that automobiles are not considered "dangerous instrument[s] so as to be classed with locomotive engines, dangerous animals, explosives, and the like." *Goodman v. Wilson*, 166 S.W. 752, 753 (Tenn. 1914). More recently, this Court has also held that *automobile racing* is not an abnormally dangerous activity, reasoning that although it carries recognizable risks, "the racing of automobiles on a track specifically designed for this purpose has become *a matter of common usage in the State of Tennessee and throughout the nation*." *Leatherwood*, 121 S.W.3d at 700 (emphasis added). Likewise,

-10-

the operation of a motorcycle, while not without risks, is undoubtedly "a matter of common usage in the State of Tennessee and throughout the nation." *Id.* Moreover, Ms. Maxwell was operating the motorcycle in a closed course under adequate supervision by trained motorcycle safety professionals. We therefore find, as the trial court did, that a motorcycle is not a dangerous instrumentality, and Ms. Maxwell's gross negligence claims must fail.

**IN CONCLUSION**

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the plaintiff, Ruth Maxwell.

_____
FRANK G. CLEMENT, JR., JUDGE