IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 3, 1999 Session

## ANNA LAMB v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. 301696     W.R. Baker, Commissioner**

---

**No. M1998-00910-COA-R12-CV - Filed October 16, 2002**

---

This appeal stems from a mother's allegations that her mentally impaired daughter was sexually abused while in the custody of the Alvin C. York Agricultural Institute. The mother filed a claim on her daughter's behalf with the Division of Claims seeking $300,000 in damages. The claim was transferred to the Tennessee Claims Commission where, following a hearing, a Commissioner dismissed the claim because the mother had failed to establish that her daughter had been sexually abused while she was in the State's custody. The mother asserts on this appeal that the evidence preponderates against the Commissioner's findings. We affirm the Commissioner's dismissal of the claim.

**Tenn. R. App. P. 12(II) Direct Appellate Review; Judgment of the Tennessee Claims Commission Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

John H. Little and Lynda Simmons, Livingston, Tennessee, and Onnie L. Winebarger, Byrdstown, Tennessee, for the appellant, Anna Lamb.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Martha A. Tarleton, Senior Counsel, for the appellee, State of Tennessee.

### OPINION

### I.

Michelle Lamb is a 25-year-old, mentally impaired woman who lives in Jamestown with her mother, Anna Lamb, and her two younger brothers. She is moderately mentally retarded, and she functions at the level of a five-year-old. Ms. Lamb also has a severe refractory seizure disorder that has been treated with surgery and requires medication to control. Ms. Lamb's conditions have significantly impaired her cognitive functions. Because she is impaired in the receptive and

expressive language, she has limited communication skills. She has a poor memory and finds it difficult to concentrate or pay attention either because of brief seizure activity or because she is sedated by the medication she is required to take.

Ms. Lamb began having seizures when she was eight months old. Her other impairments became evident after she enrolled for kindergarten at Pinehaven Elementary School, and she was placed in a special education class. At the beginning of second grade, Ms. Lamb was transferred to a special education program at York Elementary School. Her mother objected to the transfer and requested that Ms. Lamb remain in the special education room at Pinehaven Elementary. Contrary to Anna Lamb's wishes, her daughter remained at York Elementary. Her teachers reported that she was moody, that her progress was slow and difficult, and that her socialization with others was problematic.

The first report of sexual abuse involving Ms. Lamb occurred in mid-July 1990 when she told her mother during a bath that her 16-year-old cousin had engaged in oral sex with her while he was babysitting. Over one week later, Anna Lamb reported her daughter's statements to their family physician, the Department of Human Services, and the District Attorney General. The physician found what he believed to be physical corroboration of probable sexual abuse, but Ms. Lamb's cousin denied engaging in any sort of sexual conduct with her. Even though the Department suspected that Ms. Lamb had been sexually abused, Ms. Lamb's cousin was never prosecuted after he agreed to counseling and pretrial diversion.

Ms. Lamb transferred to the Alvin C. York Agricultural Institute ("York Institute") in 1991 and was enrolled in the Tennessee LRE for Life program which was designed to teach "survival skills" to students like Ms. Lamb to enable them to live in the least restrictive environment possible. The program included job training and frequent off-campus trips. Ms. Lamb apparently did not enjoy being at York Institute. In December 1991, she complained to her mother than she had been paddled at school. After taking her daughter to the emergency room, Ms. Lamb's mother complained to the school officials about the paddling. Thereafter, the school officials agreed that they would not spank Ms. Lamb and that they would try other methods of discipline.

The second report of sexual abuse involving Ms. Lamb occurred in June 1992 during the last week of school. Ms. Lamb told her mother that "somebody came into the room and jerked my pants down and stuck their finger in my butt." Her mother would not permit Ms. Lamb to return to school and requested the school's special education coordinator to come to her house to discuss the matter. Ms. Lamb never identified the perpetrator, and the special education coordinator assured her mother that Ms. Lamb was never left unsupervised. Ms. Lamb's mother later went to York Institute to tell Patty Dunn, her daughter's teacher, and Patsy Peavyhouse, a teacher's aid, that she wanted one of them to be with Ms. Lamb during the entire time she was at school. Mses. Dunn and Peavyhouse assured her that they would not leave Ms. Lamb unsupervised while she was at York Institute.

Ms. Lamb returned to York Institute in the fall of 1992 but missed a great deal of school because of her seizures. One of the outings she missed was a trip to Ms. Dunn's barn to see a new

colt. When Ms. Lamb returned to school on Monday, September 14, 1992, Ms. Dunn, with her superior's permission, decided to take her to the barn to see the colt. During the trip which lasted approximately ninety minutes, Ms. Dunn stopped by her house to change clothes because she planned to take another horse to a veterinarian in Cookeville later that day, and then drove Ms. Lamb to her barn. After Ms. Dunn returned Ms. Lamb to York Institute, she was with Ms. Peavyhouse at all times until she was placed on the bus to go home. Ms. Peavyhouse reported that Ms. Lamb seemed happy and was still talking about the horses when she got on the bus.

When Ms. Lamb arrived home, both her mother and her brother thought that she was walking in an unusual manner and that she was having difficulty sitting squarely on her seat. While helping Ms. Lamb shower that evening, her mother noticed a stain on her underwear that appeared to be dried blood. She also noticed that her daughter's rectum appeared to be swollen and torn and that she had a large bruise on her chest. When Ms. Lamb provided no explanation for these conditions, her mother decided that her daughter was again the victim of sexual abuse and that Ms. Dunn was somehow involved because her daughter had told her earlier about going to Ms. Dunn's barn. Even though Anna Lamb became distraught, she did not seek medical assistance or report her daughter's condition to the authorities that evening.

Anna Lamb did not permit her daughter to return to York Institute the following day. She telephoned her sister, Mary Sue Brannon, to tell her that she suspected that Ms. Lamb had again been molested at school. Ms. Brannon was married to a retired Command Sergeant Major in the United States Army who was the JROTC instructor at York Institute. When Ms. Brannon related her sister's concerns to her husband, Mr. Brannon reported that he had seen Ms. Lamb leaving the school with Ms. Dunn the previous day. At this point, Anna Lamb and the Brannons became convinced that Ms. Dunn and her husband, who was also a teacher at York Institute, had molested Ms. Lamb at their barn. Mr. Brannon arranged for Ms. Lamb to be examined by a physician the following day.

Ms. Lamb's physician examined her on Wednesday. While Ms. Lamb did not explain what had happened to her, her physician concluded that her injuries were probably the result of sexual abuse and that they were between one day and five days old. To help his sister-in-law, Mr. Brannon tried without success to contact the Tennessee Bureau of Investigation's ("TBI") office in Cookeville.

Anna Lamb permitted her daughter to return to York Institute on Thursday. Mr. Brannon tried unsuccessfully to contact the TBI's office in Nashville and then passed on the family's suspicions about Ms. Lamb's sexual abuse to Douglas Young, the superintendent of York Institute. Mr. Young immediately contacted John Galloway, an assistant district attorney general, who arranged to meet with Ms. Lamb and her mother at Mr. Brannon's house on Saturday.

After dropping off her daughter at school on Thursday, Anna Lamb and her two sisters, dressed in fatigues and armed with a loaded pistol, secreted themselves near the Dunns' horse barn in case the Dunns brought Ms. Lamb back to the barn. Their purpose was to shoot Patty Dunn and

her husband if they returned to the barn with Ms. Lamb. They waited for three to four hours and finally left when no one arrived at the barn.

On Saturday, September 19, 1992, Charles Scott, a TBI agent proficient at sexual abuse investigations, interviewed Ms. Lamb at the Brannon residence. He was unable to obtain any useful information from her. Mr. Brannon disapproved of Mr. Scott's investigative techniques, and after Mr. Scott left, he decided to question Ms. Lamb himself. During this conversation, Mr. Brannon professes that Ms. Lamb, for the first time, stated that she had been sexually molested by Ms. Dunn and her husband, and perhaps others, at the Dunns' home and horse barn. Mr. Brannon then telephoned Mr. Galloway and offered to bring Ms. Lamb to the sheriff's office to tell her "secret." Once at the sheriff's office, Mr. Brannon led Ms. Lamb through an account of the events of the preceding Monday. Both Messrs. Galloway and Scott believed that Ms. Lamb was a compromised witness because Mr. Brannon repeatedly asked her leading, suggestive, and professionally inappropriate questions. Neither Mr. Galloway nor Mr. Scott believed that there was any reasonable basis to suspect that the Dunns had molested Ms. Lamb.

The Department of Human Services commenced its investigation on September 24, 1992. During interviews by different caseworkers on September 24 and 28, 1992, Ms. Lamb repeated some of the information Mr. Brannon had earlier provided to the Department. After interviewing Ms. Lamb on October 8 and 9, 1992, Gary L. Aebischer, a licensed psychological examiner and certified school psychologist, concluded that "[t]he current findings are inconclusive and do not point toward a consistent scenario of sexual abuse . . .." He noted that "there are no conclusive indications that this youngster is attempting to cope with serious victimization" and that "mentally retarded youngsters can easily be influenced into providing answers which are in effect prompted by the questions posed by the inquirer."

Ms. Lamb was subjected to additional interviews and examinations for several more weeks, including a family nurse practitioner employed by Vanderbilt University School of Medicine. She remained generally uncommunicative about her injuries. Several examiners concluded that her physical condition was consistent with sexual penetration but declined to rule out other causes or to pinpoint when the penetration could have taken place. The Department referred Ms. Lamb to Dr. Sharon Brandon-Campbell, a psychologist in private practice, for counseling and safety training. During her ten sessions with Dr. Brandon-Campbell which ended on February 23, 1993, Ms. Lamb stated that Mr. and Ms. Dunn had touched her in inappropriate ways.[1]

The authorities eventually determined that the evidence did not warrant criminally prosecuting the Dunns for sexual abuse. The Dunns eventually moved to North Dakota. On September 3, 1993, Anna Lamb filed a claim with the Division of Claims Administration seeking $300,000 in damages for the negligent care, custody, and control of Ms. Lamb. She alleged that her daughter had been "raped, sodomized, sexually abused, and assaulted by person or persons unknown

---

[1]We have determined that recounting the specifics of Ms. Lamb's statements to Dr. Brandon-Campbell serves no useful purpose.

who were at the premises of CRAIG and PATTY DUNN and in the presence of PATTY DUNN." The State responded by denying the material allegations of the claim.

The claim was transferred to the Tennessee Claims Commission for trial. In preparation for the trial, the State retained Dr. William Bernet, a child and forensic psychiatrist serving as the medical director of The Psychiatric Hospital at Vanderbilt. Dr. Bernet reviewed Ms. Lamb's records and interviewed Ms. Lamb and her mother. He concluded that the physical evidence was consistent not only with sexual molestation but also with other explanations. He also determined that Ms. Lamb's statements regarding sexual abuse were not the products of her independent memory but rather were "verbal routines" that were "derived from conversations that she had with her mother, her uncle, and perhaps other relatives." Accordingly, he concluded that "[i]t is impossible to know from . . . [Ms. Lamb's] statements what actually happened to her or who did it."

The focus of Anna Lamb's proof at trial shifted away from the Dunns. She asserted that she had placed her daughter in the State's custody when she dropped her off at York Institute on the morning of September 14, 1992, and that her daughter had somehow been sexually abused by someone that day while she was in the State's custody. She reasoned that the State must have been acting negligently because the sexual abuse could not have occurred otherwise.

The Commissioner who presided over the hearing filed a judgment on March 3, 1998. Following a detailed review of the evidence, the Commissioner concluded that Anna Lamb had failed to prove by a preponderance of the evidence that her daughter had been sexually abused as a result of York Institute's negligence. Specifically, the Commissioner determined:

(1)     that it is "not clear" that the scarring in Ms. Lamb's vagina and anus were caused by sexual abuse because the medical professionals who had examined Ms. Lamb had declined to rule out the possibility of other causes;

(2)     that Ms. Lamb's fragmented descriptions of the events of September 14, 1992, did not support concluding that she had been sexually abused because they were "the product of inexpert questioning by her family which produced suggested responses;"

(3)     that even if Ms. Lamb had been sexually abused, her mother's evidence failed to establish that this abuse occurred on September 14, 1992, or that it occurred while Ms. Lamb was in the State's custody; and finally

(4)     that even if Ms. Lamb had been sexually abused on September 14, 1992, while in the State's custody, Ms. Lamb failed to demonstrate how the State had been negligent by failing to protect her from sexual abuse.

Anna Lamb has perfected this appeal. Rather than raising issues of law, her arguments focus on the evidentiary foundation of the Commissioner's judgment. She asserts that the evidence preponderates against the Commissioner's conclusion that she failed to prove that her daughter was

sexually abused on September 14, 1992. Invoking the doctrine of res ipsa loquitur, she also asserts that the State did not adequately rebut the presumption of negligence arising from her daughter's injuries because the evidence regarding her daughter's supervision at school on September 14, 1992 was "sorely lacking with regard to the Third Period between 10:00 am and 11:00 am."

## II.
### THE EVIDENTIARY FOUNDATION FOR THE COMMISSIONER'S CONCLUSIONS

We turn first to Anna Lamb's argument that the evidence does not support the Commissioner's conclusion that she failed to prove that her daughter was sexually abused on September 14, 1992. She asserts in this regard that "reasonable minds at all times would conclude that . . . [Ms.] Lamb was indeed sexually abused on September 14, 1992 while under the care, custody, and control of York Institute." While the evidence might permit reasonable persons to conclude that Ms. Lamb was sexually abused on September 14, 1992, it also permits reasonable persons, including the Commissioner, to conclude that the sexual abuse, if it occurred, did not occur on September 14, 1992.

### A.

The Tennessee Claims Commission's factual findings, like any other non-jury civil proceeding are reviewed on appeal using the standards contained in Tenn. R. App. P. 13(d). *Beare Co. v. State*, 814 S.W.2d 715, 717 (Tenn. 1991); *Pool v. State*, 987 S.W.2d 566, 569 (Tenn. Ct. App. 1998). These standards are well-settled. With regard to findings of fact, we review the record de novo and presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." We will also give great weight to any factual findings that rest on determinations of credibility. *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, in the absence of findings of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

Reviewing findings of fact under Tenn. R. App. P. 13(d) requires an appellate court to weigh the evidence to determine in which party's favor the weight of the aggregated evidence falls. There is a "reasonable probability" that a proposition is true when there is more evidence in its favor than there is against it. Thus, the prevailing party is the one in whose favor the evidentiary scale tips, no matter how slightly. *Parks Props. v. Maury County*, 70 S.W.3d 735, 741 (Tenn. Ct. App. 2001); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Parks Props. v. Maury County*, 70

S.W.3d at 742. Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

These standards for reviewing the weight of the evidence in a non-jury proceeding must necessarily be objective. In cases like this one, they cannot be colored by the vulnerability of the victim or the inherently heinous nature of the alleged conduct. Persons seeking monetary damages from the state for negligence must shoulder the same burden of proof as persons seeking monetary damages against private parties. They must establish each of the necessary elements of their claim by a preponderance of the evidence. *Branch v. McCroskey*, No. 03A01-9709-CV-00385, 1998 WL 47873, at *2 (Tenn. Ct. App. Feb. 5, 1998) (No Tenn. R. App. P. 11 application filed) (stating that "the plaintiff is not entitled to a judgment unless the plaintiff has carried his initial burden of proof, i.e., proof on all issues necessary to establish his claim").

**B.**

The claim that Ms. Lamb was sexually abused on September 14, 1992, stands or falls on the testimony of three witnesses – Dr. R. Leonard Carroll, Ms. Julie E. Rosof, and Dr. Sharon Brandon-Campbell. Dr. Carroll physically examined Ms. Lamb on September 16, 1992, at the Fentress County Hospital. Ms. Rosof, a family nurse practitioner, physically examined Ms. Lamb at Vanderbilt University School of Medicine on October 15, 1992. Dr. Brandon-Campbell provided psychological counseling to Ms. Lamb from November 18, 1992 through February 23, 1993.

Anna Lamb introduced the results of Dr. Carroll's and Ms. Rosof's physical examinations of her daughter to substantiate her claim that her daughter had been sexually abused on September 14, 1992. Both Dr. Carroll and Ms. Rosof testified that the condition of Ms. Lamb's vagina and rectum were consistent with sexual penetration, but they declined to state that sexual abuse was the only cause of the conditions they observed. Dr. Carroll testified that he observed a fresh tear in Ms. Lamb's rectum. However, by stating that the tear could have been four to five days old, he could not rule out the possibility that it had occurred prior to September 14, 1992.

Ms. Rosof's examination revealed rectal tears in different locations than the tear observed by Dr. Carroll, thereby raising the possibility that the tears she observed occurred after Anna Lamb withdrew her daughter from school. She also concluded that the conditions she observed could have been as little as one week or as long as one year old. Most significantly, Ms. Rosof conceded that her opinion regarding the results of physical examinations in sexual abuse cases had changed since she examined Ms. Lamb in October 1992. Since a biopsy of the scar tissue had not been performed, she was no longer comfortable with her original conclusion that the conditions she observed were consistent with sexual penetration and that they were consistent with severe constipation.[2]

---

[2]Ms. Lamb has a history of constipation.

Anna Lamb introduced Dr. Brandon-Campbell's testimony to prove that her daughter had identified the Dodds as persons who had abused her sexually. Ms. Lamb made these statements more than two months after the alleged abuse occurred after she had been exposed to repeated suggestive questioning by the members of her family. This repeated questioning undermined the probative value of Ms. Lamb's statements. Both Mr. Galloway and Mr. Scott found these statements unreliable as early as September 19, 1992. Mr. Aebischer likewise discounted them in October 1992. Dr. Bernet concluded that they were "verbal routines," not derived from Ms. Lamb's independent memory, but rather from her conversations with her mother, uncle, and other family members.

After reviewing this record de novo, we have determined that the State presented strong, probative evidence that undermined the testimony of Dr. Carroll, Ms. Rosof, and Dr. Brandon-Campbell. Reasonable persons considering this evidence could easily conclude that it does not establish by a preponderance of the evidence that Ms. Lamb had been sexually abused on September 14, 1992. Accordingly, the evidence does not preponderate against the Commissioner's conclusion that Anna Lamb had failed to prove that her daughter had been sexually abused on September 14, 1992.

### III.
### ANNA LAMB'S INVOCATION OF THE RES IPSA LOQUITUR DOCTRINE

Anna Lamb's claim was originally premised on the assertion that the Dunns had sexually abused her daughter on September 14, 1992. As this theory began to unravel, she broadened her claim to a more general one based on the doctrine of res ipsa loquitur. Instead of identifying the Dunns as the wrongdoers, she asserted that her daughter had been sexually molested on September 14, 1992 while in the custody of the staff of York Institute and that sexual molestation can occur at York Institute only when the staff negligently fails to supervise the students. On this appeal, she insists that the Commissioner's decision should be vacated because the State failed to demonstrate that the staff of York Institute took adequate precautions to safeguard her daughter on September 14, 1992, specifically between 10:00 a.m. and 11:00 a.m. This argument fails for two reasons. First, Anna Lamb's case was not strong enough to require the State to explain how it was acting with due care to protect her daughter on September 14, 1992. Second, the State presented evidence from which a reasonable person could easily conclude that the staff of York Institute was not negligent with regard to its supervision of Ms. Lamb on September 14, 1992.

### A.

The res ipsa loquitur doctrine is a rule of evidence, not a rule of law. *Quinley v. Cocke*, 183 Tenn. 428, 438, 192 S.W.2d 992, 996 (1946). It is intended to come to the aid of plaintiffs who have no direct evidence of a defendant's negligence, *Provident Life & Accident Ins. Co. v. Professional Cleaning Serv., Inc.*, 217 Tenn. 199, 208, 396 S.W.2d 351, 356 (1965), by providing a specialized vehicle for considering circumstantial evidence in negligence cases. *Poor Sisters of St. Francis v. Long*, 190 Tenn. 434, 442-43, 230 S.W.2d 659, 663 (1950). It permits, but does not require, a fact

finder "to infer negligence from the circumstances of an injury." *Seavers v. Methodist Med. Ctr.*, 9 S.W.3d 86, 91 (Tenn. 1999); *Shivers v. Ramsey*, 937 S.W.2d 945, 949 (Tenn. Ct. App. 1996).

Persons relying on the res ipsa loquitur doctrine need not prove specific acts of negligence by the defendant. *Summit Hill Assocs. v. Knoxville Utils. Bd.*, 667 S.W.2d 91, 96 (Tenn. Ct. App. 1983); *Parker v. Warren*, 503 S.W.2d 938, 942 (Tenn. Ct. App. 1973). They may instead base their case on the circumstances surrounding the injury if common experience indicates "(1) that the injury was probably the result of negligence, even though the exact nature of the negligence is unknown, and (2) that it was probably the defendant who was the negligent person." *Burton v. Warren Farmers Coop.*, No. M1999-00486-COA-R3-CV, 2002 WL 31039345, at \*6 (Tenn. Ct. App. Sept. 12, 2002).

The courts must take care to avoid applying the res ipsa loquitur doctrine in a way that undermines our system of tort liability based on fault. Fowler V. Harper et al., *The Law of Torts* § 19.5, at 27-30 (2d ed. 1986) ("Harper"). It is not enough for a plaintiff to prove that he or she was injured by some unidentified person's negligence. Even though there is beyond all reasonable doubt "negligence in the air," the plaintiff must still bring the negligence home to the defendant. W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 39, at 248 (5th ed. 1984). The plaintiff must present evidence that affords a rational basis for concluding that the negligent conduct that caused the injury is probably attributable to the defendant. 1 Dan B. Dobbs, *The Law of Torts* § 157, at 378 (2001); Harper § 19.7, at 45-46.

The presumption of negligence arising from the operation of the res ipsa loquitur doctrine is rebuttable. *Schindler v. Southern Coach Lines, Inc.*, 188 Tenn. 169, 173, 217 S.W.2d 775, 777 (1949); *Shivers v. Ramsey*, 937 S.W.2d at 949. Thus, if a plaintiff satisfies all the elements of a res ipsa loquitur claim, the burden of going forward shifts to the defendant to explain or demonstrate that it acted with reasonable care under the circumstances. *Summit Hill Assocs. v. Knoxville Utils. Bd.*, 667 S.W.2d at 96; *Parker v. Warren*, 503 S.W.2d at 943. If the defendant offers no explanation of its conduct, the fact finder may justifiably conclude that the defendant is liable for the plaintiff's injuries. *Southeastern Aviation, Inc. v. Hurd*, 209 Tenn. 639, 662, 355 S.W.2d 436, 446 (1962); *Armes v. Hulett*, 843 S.W.2d 427, 432 (Tenn. Ct. App. 1992).

The res ipsa loquitur doctrine addresses only two of the five elements of a common-law negligence claim.[3] "It permits an inference that the defendant breached a duty it owed to the plaintiff. It also permits an inference that the defendant's conduct, whatever it was, caused the plaintiff's injury. Thus, to succeed with a negligence claim, a plaintiff relying on the doctrine must still prove: (1) that the defendant owed a duty to him or her and that the apparent cause of the injury lies within the scope of this duty; (2) that the plaintiff suffered an injury; and (3) that the defendant's

_____

[3]A person seeking damages for negligence must prove: (1) that the defendant owed him or her a duty of care, (2) that the defendant's conduct breached this duty, (3) that the person seeking damages suffered an injury or loss, (4) that the defendant's conduct was the cause-in-fact of his or her injury or loss, and (5) that no existing rule of law relieves the defendant from liability for its negligence. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

conduct, whatever it may have been, was the legal cause of the plaintiff's injury." *Burton v. Warren Farmers Coop.*, 2002 WL 31039345, at \*8.

**B.**

Anna Lamb's evidence falls short of establishing a prima facie res ipsa loquitur claim. It is missing several key ingredients. First, her evidence does not establish that her daughter was, in fact, injured on September 14, 1992 while in the care of the staff of York Institute.[4] Second, even if the physical evidence is consistent with past sexual abuse, Anna Lamb has not established that Ms. Lamb's injuries were probably caused by negligence and that this negligence is attributable to the staff of York Institute. Thus, because Anna Lamb failed to satisfy the requirements for a res ipsa loquitur claim, the State never assumed the burden of demonstrating that the staff of York Institute was using due care in its supervision of Ms. Lamb on September 14, 1992.

Anna Lamb's claim fares no better even if we overlook the shortcomings of her res ipsa loquitur evidence and examine the State's proof regarding her daughter's supervision on September 14, 1992. Anna Lamb challenges the adequacy of her daughter's supervision between 10:00 a.m. and 11:00 a.m. and for the three to five minutes sometime after noon when Ms. Dunn left her unattended. The State concedes, as it must, that it owed a duty to Ms. Lamb while she was at York Institute and offered detailed testimony regarding its supervision of Ms. Lamb from the time she arrived at school on September 14, 1992, until the time she was placed on the bus to go home. This evidence, consisting of the testimony of Mses. Dunn and Peavyhouse, provides more than an ample basis for a fact finder to determine that the staff at York Institute was not negligent in the manner in which they were supervising Ms. Lamb on September 14, 1992.

**IV.**

We affirm the Commissioner's judgment dismissing Anna Lamb's claim and remand the claim to the Tennessee Claims Commission for whatever further proceedings may be required. We tax the costs of this appeal to Anna Lamb and her surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[4] Even if we were to find that the evidence establishes that Ms. Lamb had been sexually molested at some time, the evidence is not sufficient to pinpoint September 14, 1992 as the date on which the molestation occurred.