IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 6, 2025 Session

## KERRY DAVIS, SURVIVING HUSBAND OF SYLVIA DAVIS, DECEASED v. GARRETTSON ELLIS, MD

**Appeal from the Circuit Court for Shelby County**
**No. CT-002190-12  Rhynette N. Hurd, Judge**

_____

### No. W2024-01467-COA-R3-CV

_____

This is the second appeal in this healthcare liability matter. The plaintiff first appealed from the trial court's grant of summary judgment to the defendant physician. This court reversed that judgment in 2020. Upon remand, a trial before a jury resulted in a defense verdict. The plaintiff again appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which KENNY ARMSTRONG and VALERIE L. SMITH, JJ., joined.

Gary K. Smith and C. Philip M. Campbell, Memphis, Tennessee, for the appellant, Kerry Davis.

Jennifer S. Harrison and Kyler S. Garmen, Memphis, Tennessee, and James E. Looper, Nashville, Tennessee, for the appellee, Garrettson Ellis, M.D.

## OPINION

## I. BACKGROUND

In January 2011, Sylvia Davis ("Patient") was a 40-year-old female with a medical history including hypertension, type 2 insulin dependent diabetes mellitus, and a history of Methicillin-resistant Staphylococcus ("MRSA"). Patient presented to the Emergency Room ("ER") at Methodist Hospital in Germantown, Shelby County, Tennessee, on January 18, 2011, with complaints of a moderate, productive cough for the past four days,

along with fever, shortness of breath on exertion, nausea, and vomiting. She had been in a rear-end collision motor vehicle accident ("MVA") three days prior and reported mid-back to lower-back pain believed to be resulting from the MVA.

An evaluation by a nurse practitioner at approximately 11:10 a.m. documented that Patient had fever, chills, moderate chest pain, and minimal shortness of breath. Upon a chest x-ray showing bilateral pulmonary infiltrates within the right upper lobe posteriorly and within the right middle lobe, Patient was diagnosed with pneumonia and admitted to the telemetry floor. There she was maintained on supplemental oxygen by binasal cannula and a simple face mask. Medications and breathing treatments were additionally administered.

The next morning, January 19th, Patient had a respiratory rate of 20 and an oxygen saturation ("O2 sat") of 90-94%. During the afternoon, Patient's breathing treatments were discontinued, her antibiotics were changed, and intravenous ("IV") fluids were ordered. At approximately 4:00 p.m., the defendant Garrettson Ellis, M.D., a pulmonologist/critical care specialist, performed a pulmonary consultation on Patient. He observed that she had an O2 sat of 93% on 100% non-rebreather ("NRB") mask. Dr. Ellis changed the antibiotic and ordered an echocardiogram for edema. He also ordered a "stat" transfer from the telemetry floor to the Intensive Care Unit ("ICU") "for close observation and intubation when needed." He charted that Patient "need[ed] admission to ICU as [Dr. Ellis] suspect[ed] she'll get worse before she gets better." He indicated that Patient would "likely need intubation and mechanical ventilation within the next 24 hours." Dr. Ellis noted that Patient's oxygen level would be titrated "as needed to maintain appropriate saturation."

Dr. Ellis's shift ended at 6:00 p.m. on January 19th, and Patient's last documented O2 sat before his departure was 92% on a 100% NRB mask. Patient's vital signs were stable at the time Dr. Ellis's shift ended. After Dr. Ellis departed, ten other professional healthcare providers cared for Patient:

1. Rachel Patterson (RN),
2. Stephanie Higgins-Chalmers (RN),
3. Vivian Cullen (RN),
4. Dr. Gill Herren (ER),
5. Dr. Glenn Williams (Pulmonology/Critical Care intensivist),
6. Crystal Yekaitis Respiratory Therapist,
7. Teresa Vaughn (RN),
8. Dr. Eric Blakney (Internal Medicine/Hospitalist),
9. Dr. Carle Kalsi (ER), and
10. Dr. Dwayne Accardo (Anesthesia).

At 6:49 p.m., ICU Respiratory Therapy ("RT") documented that Patient's respirations were "regular" and "unlabored" with no retractions. Ten minutes later,

Patient's O2 sat decreased to 69%. In response, one of the three ICU nurses called the ER physician and received an order to measure Patient's arterial blood gasses ("ABGs"). During that phone call with the ER physician, Patient's O2 sat increased to 85%.

At approximately 7:00 p.m., Dr. Glenn Williams (the on-coming intensivist and Dr. Ellis's medical partner) was notified of Patient's O2 sat. He ordered facemask ventilation as needed, IV fluids, and placement of a urinary catheter. The ABG results were documented at 7:30 p.m., and ICU RT changed Patient's NRB mask to non-invasive BiPAP ventilation at 7:45 p.m. Patient's O2 sat thereafter increased to 96%. At 8:10 p.m., Dr. Eric Blakney was at Patient's bedside. He ordered Ativan, which was given to Patient at approximately 10:45 p.m. via IV.

At 10 p.m., Patient's O2 sat was documented at 89%. Around 11:00 p.m., her O2 sat was 78%. After Dr. Williams was notified, he told the ICU nurse to call the ER physician, Dr. Carle Kalsi, to come intubate Patient. Sedation for intubation was given and, at 11:10 p.m., Dr. Kalsi prepared to intubate Patient. From 11:10 p.m. to 11:36 p.m., Patient did not have a breathing tube. Ambu Bagging[1] occurred between Dr. Kalsi's three unsuccessful intubation attempts. After the three failed intubation attempts, at 11:35 p.m., Patient had no pulse and chest compressions began. After Patient was successfully intubated at 11:36 p.m. by Dr. Dwayne Accardo, CPR was continued and heart activity recovered.

At 5:23 a.m., Patient showed ventricular tachycardia. Despite resuscitative measures being carried out, Patient ultimately passed away at 5:40 a.m. on January 20, 2011. The death certificate reflected the cause of death as multilobar pneumonia. An autopsy revealed, *inter alia*, the following findings: (1) Confluent bronchopneumonia with focal areas consistent with diffuse alveolar damage; (2) Remote myocardial infarct involving left ventricle with focal moderate to severe atherosclerosis of left anterior descending coronary artery; (3) Mild aortic atherosclerosis; and (4) Severe diabetic and hypertensive nephropathy.

This action was filed on May 16, 2012. Plaintiff Kerry Davis ("Husband") asserted that because of the lengthy delay in the placement of an endotracheal tube in Patient, she deteriorated and died. He alleged that she would have survived and recovered if she had been timely intubated at or very shortly after the time Dr. Ellis had noted she was likely going to need to be intubated. Husband contended that if Patient had not been allowed to deteriorate to the point that her condition became a medical emergency, efforts to place an endotracheal tube would not have failed, and Patient would not have died.

The jury trial began on April 1, 2024. Generally, Dr. Kyle Gunnerson, Husband's

---

[1] An "Ambu Bag," also known as a bag valve mask or manual resuscitator, is a hand-held device used to manually provide positive pressure ventilation to patients.

expert, testified that earlier intubation, when Patient was first transferred to the medical-ICU, would have avoided the cardiorespiratory arrest. He asserted that intubation was not timely planned for and undertaken to accomplish it before the situation became an emergency. Dr. Gunnerson argued that Dr. Ellis should have provided a "pathway" or "help" for providers caring for Patient later in the night. He opined that the intubation should have occurred within two to three hours of the 4:00 p.m. consultation. He alleged that the emergency resulted in the intubation becoming more difficult and leading to Patient's death.

Dr. Ellis's expert, Dr. Todd Rice, a Vanderbilt Medical Center pulmonologist and intensivist, observed that Dr. Ellis was never Patient's intensivist; rather Dr. Williams was. According to Dr. Rice, mandating that Dr. Ellis communicate a plan for when Dr. Williams should intubate Patient was not required by the standard of care, nor would it happen in normal practice.

Dr. Rice related that Patient needed neither non-invasive ventilation nor intubation between 4:00-6:45 p.m. when she arrived at the ICU because she had an adequate level of oxygen at 93%. He observed that patients can come to the ICU in need of oxygen, get appropriate treatment, start improving, and never need intubation. Dr. Rice noted that a percentage of patients tend to turn a corner and never need mechanical ventilation; thus, it was not guaranteed that Patient would need intubation.

As to the events that culminated in Patient's death, Dr. Rice opined that Patient arrested because it took a while to get the tube into her trachea, started on the ventilator, and supported with her breathing. In Dr. Rice's view, Dr. Ellis's recommendations and care did not have any bearing on the arrest. He asserted the standard of care provided by Dr. Ellis did not cause any injury to Patient.

Dr. Ellis, the Medical Director of the Medical-ICU at Methodist Hospital, testified that when he saw Patient, she was on a NRB mask and had maintained an appropriate saturation (93%). Patient's oxygen was stable, she was not in distress, and she was talking, answering questions, and giving subjective information. According to Dr. Ellis, when he performed his pulmonary consultation, Patient did not need to be intubated at that time. He felt Patient was in acute respiratory failure, was critical and stable, but he recognized that she could become unstable. He acknowledged that the road to respiratory failure can be slow or sudden. Dr. Ellis related that there was no guarantee that Patient was going to get worse; he claimed that you do not put someone on a noninvasive ventilator or intubate them if they do not need it at the time. He communicated with the ICU team to monitor Patient, escalate therapy as needed, give her a diuretic and a blood pressure medication, and possibly intubate at some point.

According to Dr. Ellis, earlier intubation and mechanical ventilation would not have prevented Patient's arrest, as arrest is a known risk of doing any procedure and Patient was

- 4 -

at risk for respiratory arrest. He contended that he complied with the standard of care in his treatment of Patient and asserted that his care did not cause Patient any injury that would not otherwise have happened.

On April 5, 2024, the jury concluded that Dr. Ellis was not at fault in causing any injury to Patient. Having answered the first question "no" on the verdict form, the jury was not required to deliberate further and answer the questions regarding causation and damages. Judgment on the jury verdict was entered on April 16, 2024. Husband thereafter filed a timely notice of appeal.

## II. ISSUES

The issues raised by Husband are restated as follows:

1. Whether the trial court, in its role as the thirteenth juror, erred by declining to find that the evidence preponderated against the jury's determination.

2. Whether the trial court erred by allowing evidence at trial that Husband's expert, Dr. Gunnerson, submitted an errata sheet and affidavit in this case.

3. Whether the trial court erred by disallowing evidence at trial regarding this court's opinion in *Davis v. Ellis*, No. W2019-01367-COA-R3-CV, 2020 WL 6499559 (Tenn. Ct. App. Nov. 5, 2020).

4. Whether the trial court erred by permitting evidence of Husband's remarriage.

5. Whether the trial court erred by permitting defense expert, Dr. Rice, to testify regarding the types of ICUs.

6. Whether the trial court erred by instructing the jury on alternate methods and hindsight.

7. Whether the trial court erred by awarding discretionary costs to Dr. Ellis.


## III. STANDARD OF REVIEW

"Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. R. 13(d). In determining whether there is material evidence to support a verdict, the appellate court must: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the

verdict; and (4) discard all countervailing evidence. *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). Our review of the trial court's resolution of questions of law is *de novo* upon the record, with no presumption of correctness. *Spencer v. Norfolk S. Ry. Co.*, 450 S.W.3d 507, 510 (Tenn. 2014).

## IV. DISCUSSION

### The Thirteenth Juror

As observed by our Supreme Court in *Family Trust Services LLC v. Green Wise Homes LLC*, 693 S.W.3d 284 (Tenn. July 10, 2024):

> In Tennessee, a judge presiding over a jury trial has a duty not only to sit as judge, but must also sit as a thirteenth juror who independently reviews and weighs the evidence at trial. *Holden v. Rannick*, 682 S.W.2d 903, 904-05 (Tenn. 1984). If the trial court is dissatisfied with the jury's verdict or disagrees with the jury as to the weight of the evidence, it must order a new trial. Tenn. R. Civ. P. 59.06; *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 (Tenn. 2013) (citing *Jones v. Idles*, 114 S.W.3d 911, 914-15 (Tenn. 2003)). The trial judge cannot simply defer to the jury's decision but must make an independent judgment. *Holden*, 682 S.W.2d at 906; *Bradley v. Bishop*, 538 S.W.3d 518, 536 (Tenn. Ct. App. 2017) (citing *Dickey v. McCord*, 63 S.W.3d 714, 718-19 (Tenn. Ct. App. 2001)) . . . .

*Id.* at 297.

In this state, "if a motion for a new trial is filed, then the trial court is under a duty to independently weigh the evidence and determine whether the evidence 'preponderates' in favor of or against the verdict." *Blackburn v. CSX Transp., Inc.*, No. M2006-01352-COA-R10-CV, 2008 WL 2278497 at *6 (Tenn. Ct. App. May 30, 2008) (citations omitted). As the "thirteenth juror," the trial court is required to approve or disapprove the verdict. *Loeffler v. Kjellgren*, 884 S.W.2d 463, 468 (Tenn. Ct. App. 1994) (citation omitted), after "an independent decision on the issues." *Holden*, 682 S.W.2d at 906. If the trial judge gives reasons, "the appellate court will only look to them for the purpose of determining whether the trial court passed upon the issue and was satisfied or dissatisfied with the verdict." *Blackburn*, 2008 WL 2278497 at *7 (citations omitted).

Husband argues that the jury's verdict in this case was contrary to the weight of the evidence. He asserts that Dr. Gunnerson provided ample evidence of a breach of the standard of care by Dr. Ellis.

In *Dickey v. McCord*, 63 S.W.3d 714 (Tenn. Ct. App. 2001), we observed that a jury is not bound to accept an expert witness's testimony as true. *Id.* 63 S.W.3d at 720-21:

Expert opinions, at least when dealing with highly complicated and scientific matters, are not ordinarily conclusive in the sense that they must be accepted as true on the subject of their testimony, but are purely advisory in character and the trier of facts may place whatever weight it chooses upon such testimony and may reject it, if it finds that it is inconsistent with the facts in the case or otherwise unreasonable. Even in those instances in which no opposing expert evidence is offered, the trier of facts is still bound to decide the issue upon its own fair judgment, assisted by the expert testimony .... this is especially true when the opinion ... amounts to no more than prediction or speculation.

*Id.* at 720 (citing *Gibson v. Ferguson*, 562 S.W.2d 188, 189-90 (Tenn. 1976)).

Dr. Ellis's medical expert, Dr. Rice, generally testified that Dr. Ellis did not violate the applicable standard of care and did not cause Patient's injury. He observed that Dr. Ellis was serving as a critical care physician (intensivist) when Patient was in ICU and acknowledged that the treatment provided by Dr. Ellis was within the standard of care for a pulmonologist/intensivist. Dr. Rice asserted that there was no guarantee that Patient would need intubation and related that the standard of care requires attempts to safely avoid intubation. Although he agreed with Dr. Gunnerson that positive pressure ventilation was not going to maintain the saturation level enough to avoid intubation, he observed that it was okay to attempt it.

Rachel Patterson, RN, on shift when Patient arrived in the ICU, testified that Patient was stable on arrival and care was coordinated with Dr. Williams (intensivist) and Dr. Herren (ER). She observed that if she felt a patient needed to be intubated, in the absence of an intensivist or pulmonologist, ER physicians would have performed the intubation. Stephanie Higgins-Chalmers, RN, related at trial via deposition that she paid close attention to Patient's respiratory status and communicated with the ICU RT. She talked with Dr. Blakney about Patient when he was in the room at approximately 8:10 p.m. Eventually, after Patient's O2 sats remained low, she called Dr. Williams for orders. Ms. Higgins-Chalmers recalled that Patient did not have cardiac and respiratory arrest until after the three failed intubation attempts by Dr. Kalsi.

The jury in this case heard the testimony on both sides, weighed it as it saw fit, and found Dr. Ellis was not at fault. Taking the strongest legitimate view of all the evidence to uphold the verdict, while assuming the truth of all that tends to support it and discarding all to the contrary, we find that the record before us contains material evidence to support the jury's verdict. *See Dickey*, 63 S.W.3d at 721. The record reveals that the trial court independently weighed the evidence, found that it did not preponderate against the verdict, and properly approved the jury verdict. The court, therefore, correctly fulfilled its obligations as the thirteenth juror.

## Errata Sheet/Affidavit

In his expert disclosure, Husband stated that "Dr. Gunnerson is expected to testify that the deviations from the standard of care by Dr. Ellis caused Patient's death[.]" The disclosure contained no reference to the various types of ICU settings and how Dr. Gunnerson was/was not familiar with each such setting. There was no mention of the fact that Dr. Gunnerson did not work in a Medical-ICU (where Patient was).

The first deposition of Dr. Gunnerson was taken on February 12, 2019. At that time, upon targeted questioning by Dr. Ellis's counsel, Dr. Gunnerson revealed that there are different types of ICUs and that he had not worked in a Medical-ICU since residency. Upon Dr. Ellis moving for summary judgment on March 29, 2019, Dr. Gunnerson submitted a hand-written, signed, five-page errata sheet that included, according to the defense, a change in his testimony from "could" to "would." Dr. Gunnerson further submitted a sworn, notarized six-page affidavit, in part, "for purposes of clarification."

The trial court granted summary judgment to Dr. Ellis, but this court ultimately reversed that judgment. *See Davis v. Ellis*, No. W2019-01367-COA-R3-CV, 2020 WL 6499559 (Tenn. Ct. App. Nov. 5, 2020)). Upon remand, more than three years after his first deposition, Dr. Gunnerson was deposed again in March 2022. When questioned about his forms of testimony and communications with Husband's counsel, Dr. Gunnerson stated that he was simply doing what he was requested by the attorney. (Q: … After your deposition, after your errata sheet, why did you – why did you feel the need to sign off on this? A: Well, I was doing what I was told as far as reviewing – you know, I needed to – make an affidavit. And, again, I'm not completely privy to the details of the law. I'm just, you know, at the request of the attorney with this….").

Husband argues that Dr. Ellis should have been precluded from offering evidence or argument regarding Dr. Gunnerson's expert services during this case. He asserts that the trial court erred in allowing argument on the subject of Dr. Gunnerson's execution of an errata sheet and affidavit without permitting Husband to point out to the jury that the Court of Appeals had found that Dr. Gunnerson's affidavit had been properly submitted and that his deposition testimony and affidavit did not materially differ. According to Husband, Dr. Gunnerson was questioned at trial to the effect that he had "changed" his opinions, implying that Dr. Gunnerson and his testimony should be viewed as less credible and less worthy of acceptance on the issue of whether Dr. Ellis deviated from the standard of care.

Decisions regarding the admissibility of evidence rest within the sound discretion of the trial court. *Stanfield v. Neblett*, 339 S.W.3d 22, 30 (Tenn. Ct. App. 2010). "[T]rial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Dickey*, 63 S.W.3d at 723. It

is well settled that the "propriety, scope, manner, and control" of cross-examination of witnesses is within the discretion of the trial court and will not be interfered with in the absence of an abuse of discretion. *Laseter v. Regan*, 481 S.W.3d 613, 633 (Tenn. Ct. App. 2014) (quoting *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012)). "A trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning and which causes an injustice to the complaining party." *Doe 1 ex rel. Doe 1 v. Roman Cath. Diocese of Nashville*, 154 S.W.3d 22, 42 (Tenn. 2005). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

The purpose of cross-examination is "to adduce from a witness any information that may clarify, qualify, or undercut a witness's testimony on direct examination, impair its effectiveness, or affect the inferences the trier-of-fact might draw." *Laseter*, 401 S.W.3d at 628. The Tennessee Rules of Evidence provide that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" Tenn. R. Evid. 611(b); *see also Laseter*, 481 S.W.3d at 633. The Rule allows for the "wide-open scope of cross-examination historically favored in Tennessee." Tenn. R. Evid. 611, Adv. Comm'n Cmt. "[A] witness may be cross-examined to show possible prejudice or bias, and this right should be limited only upon a showing of the most extraordinary circumstances." *Laseter*, 481 S.W.3d at 633 (citing *Phillips v. Pitts*, 602 S.W.2d 246, 249 (Tenn. Ct. App. 1980)).

A party may examine a witness concerning prior statements. Tenn. R. Evid. 613(a). Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness. Tenn. R. Civ. P. 32.01. Trial courts use safeguards "to temper the legitimate concern that a deponent may try to change his or her prior testimony as a tactical strategy rather than a correction of a legitimate error." *Borngne ex rel. Hyter v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, No. E2020-00158-COA-R3-CV, 2021 WL 2769182 at *7 (Tenn. Ct. App. July 1, 2021) (reversed on other grounds). Such safeguards include, but are not limited to, reconvening a deposition and trial cross-examination on submitted changes. *Id.*

We cannot find that the trial court abused its discretion in concluding that the jury was entitled to receive the full breadth of the opinions offered by Dr. Gunnerson in this case. The opinions were provided under oath and/or under penalty of perjury. Plaintiff chose to call Dr. Gunnerson at trial. The trial court allowing cross-examination was not an error, did not unfairly affect the judgment, and did not result in prejudice to the judicial process.

## Previous Court of Appeals' Opinion in *Davis v. Ellis*

It is argued by Husband in this appeal that he should be allowed to present evidence and argument regarding our opinion in *Davis v. Ellis*, No. W2019-01367-COA-R3-CV,

2020 WL 6499559 (Tenn. Ct. App. Nov. 5, 2020). The defense asserts that because this court's determinations arose in the context of a summary judgment finding that there were genuine issues of material fact, our rulings on an issue of law should not be presented to the jury.

Our prior opinion did not supplant the need of a fact-finding jury regarding the substance, weight, and/or credibility of Dr. Gunnerson and/or his testimony. We find Rule 403 of the Tennessee Rules of Evidence applicable here:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the <u>danger of unfair prejudice, confusion of the issues, or misleading the jury</u>, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403 (emphasis added). We agree with the trial court that there was risk the jury would misconstrue the rulings set forth in the opinion as determinations on the merits of the case. Upon our review, the evidence supports the conclusion of the trial court that any probative value of the opinion is substantially outweighed by the clear danger of unfair prejudice, confusion of the issues, and misleading the jury.

## Husband's Proposed Special Instructions

Husband further contends that the trial court erred by not instructing the jury on the findings of our prior opinion as to Dr. Gunnerson. We disagree and find that Husband's proposed instructions were inappropriate.

Trial courts should give a requested instruction if it satisfies three requirements: (1) it is supported by the evidence, (2) it embodies the party's theory, and (3) it is a correct statement of the law. *See Mitchell v. Smith*, 779 S.W.2d 384, 390 (Tenn. Ct. App. 1989) (citations omitted).

Plaintiff's proposed special instructions likely would have confused the issues and misled the jury. Our review reveals that there was no evidence of our opinion presented at trial, as the trial court determined it would unnecessarily cause confusion, mislead the jury, and distract from the ultimate issues. At trial, Dr. Ellis's actions did not contradict our prior opinion's rulings; as acknowledged by the defense, it was highlighted that Dr. Gunnerson had a variety of forms of testimony in this case. However, Husband had ample opportunity to explain Dr. Gunnerson's various forms of testimony and/or bolster his expert through examination and/or argument. The trial court's refusal to provide the proposed instructions was not error, did not affect the judgment, and was not prejudicial to the judicial process.

## Husband's Remarriage

Husband sought to exclude evidence that he remarried one year after Patient's passing. Upon the trial court determining that the evidence of remarriage is relevant to the loss of consortium claim, Husband contends that he was "forced" to raise the issue first at trial, even though it should have been off limits. He asserts that defense counsel unfairly emphasized the issue of his remarriage repeatedly.

Husband relies on *Phelps v. Magnavox Co. of Tennessee*, 497 S.W.2d 898 (Tenn. Ct. App. 1972) a Court of Appeals case which predated wrongful death loss of consortium claims in Tennessee. *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593 (Tenn. 1999) is controlling law on this issue in this healthcare liability case. In *Jordan*, the Tennessee Supreme Court abrogated *Davidson Benedict Co. v. Severson*, 72 S.W. 967 (Tenn. 1903) and expanded the scope of "pecuniary value" to include consortium damages, which that Court defined as including losses by family members of the deceased's "attention, guidance, care, protection, training, companionship, cooperation, affection, love, and in the case of a spouse, sexual relations." *Id.* at 601-02.

As we noted earlier, decisions regarding the admissibility of evidence rest within the sound discretion of the trial court. *Stanfield*, 339 S.W.3d at 30. Evidence is relevant and therefore admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence that is relevant under Rule 401 "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Tenn. R. Evid. 403. The court must balance the probative value of the evidence and the potential prejudice to the objecting party.

As remarriage results in the replacement of at least some of the damages to the spouse of a decedent, remarriage is inherently relevant to a loss of consortium claim. We find that this evidence was not prejudicial to the judicial process. The trial court properly denied Husband's request to preclude evidence of his remarriage and then properly admitted evidence regarding same.

## Dr. Rice's ICU Testimony

Husband challenges the fact that Dr. Rice explained the factual differences between a medical ICU and other specialty ICUs, asserting that the testimony constituted previously undisclosed expert opinions beyond the four corners of Dr. Ellis's Rule 26 expert disclosure. Rule 26.02 of the Tennessee Rules of Civil Procedure provides in pertinent part:

> (4) Trial Preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision

(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

   (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and <u>a summary of the grounds for each opinion</u>… (ii) A party may also depose any other party's expert witness expected to testify at trial.

Tenn. R. Civ. P. 26.02 (emphasis added).

Dr. Gunnerson's summary of the facts is silent on the distinction between a Medical-ICU and other ICUs. Only when he was deposed, upon questioning by Dr. Ellis's counsel, did Dr. Gunnerson reveal that he did not work in a Medical-ICU, the type of ICU in which Patient was treated. In Dr. Ellis's expert disclosure regarding Dr. Rice, Dr. Ellis indicated that "Dr. Rice is expected to refute the standard of care and causation opinions of Dr. Gunnerson[.]" During direct examination at trial, Dr. Gunnerson testified that there are different types of ICUs. On cross examination, defense counsel elicited testimony from Dr. Gunnerson regarding his experience with the various types of ICUs and the type of ICU in this case. ("Q: And when I'm talking about ICU, I'm talking about a medical ICU. That's what this was in this case, correct? A: Yes." … "Q: All right. And you've never actually been an intensivist or a pulmonologist or even worked in a community hospital like Methodist Germantown, correct? A: No."). During rebuttal proof, on direct examination, Dr. Rice testified regarding the different types of ICUs.

Again, as we noted earlier, decisions regarding the admissibility of evidence rest within the sound discretion of the trial court. *Stanfield*, 339 S.W.3d at 30. Expert testimony should only be excluded when there would be unfair surprise or trial by ambush. *Id.* at 31-32. In this case, Dr. Ellis informed Husband that Dr. Rice would rebut the testimony of Dr. Gunnerson. When, on direct examination, Dr. Gunnerson testified that there are different types of ICUs, he opened the door to rebuttal testimony regarding the factual differences between ICU types. The trial court ruled that Dr. Rice's testimony did not violate Rule 26 because Dr. Ellis's expert disclosures contained a statement that he would "refute" the opinions of Dr. Gunnerson and the disclosures "were broad enough to cover the challenged testimony." As the testimony did not constitute an unfair surprise and did not result in any trial by ambush, we find the trial court's reasoning on this issue was sound.

## Jury Instructions

The soundness of every jury verdict rests on the fairness and accuracy of the trial court's instruction. *Bara v. Clarksville Mem'l Health Syst., Inc.*, 104 S.W.3d 1, 3 (Tenn.

Ct. App. 2002). A "trial court's instructions should be complete and accurate and should fairly reflect the parties' theories of the case." *Ladd by Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 102 (Tenn. Ct. App. 1996). The trial court has the duty to "instruct on every issue of fact or theory of the case raised by the pleadings and supported by the proof." *Cole v. Woods,* 548 S.W.2d 640, 642 (Tenn. 1977) (citations omitted). The jury charge will be "viewed in its entirety and considered as a whole in order to determine whether the trial judge committed prejudicial error." *Abbott by Abbott v. American Honda Motor Car Co. Inc.*, 682 S.W.2d 206, 206 (Tenn. Ct. App. 1984) (citations omitted).

As we indicated previously, a trial court should give a requested instruction if it satisfies three requirements: (1) it is supported by the evidence, (2) it embodies the party's theory, and (3) it is a correct statement of the law. *Mitchell v. Smith*, 779 S.W.2d 384, 390 (Tenn. Ct. App. 1989) (citations omitted).

## Alternative Methods Instruction

In actions related to healthcare liability, the Tennessee Pattern Jury Instructions expressly utilize an "Alternate Methods" instruction:

> When there is more than one accepted method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all physicians of good standing, a physician is not negligent for selecting an accepted method of diagnosis or treatment that later turns out to be unsuccessful. This is true even if the method is one not favored by certain other physicians.

T.P.I. - Civil 6.14 (2023 ed.). The trial court in this matter delivered the charge verbatim to the jury.

Husband contends that the alternate methods instruction did not apply to this case because the relevant issue was not the manner or method of intubation that Patient needed but the timing—the failure to plan for an intubation when it was likely needed in the next 24 hours because Patient was going to get worse before getting better. Dr. Gunnerson maintained that delay of inevitable care is not an alternative method or approach.

Dr. Ellis argues that he had a plan of care for Patient that was dictated and hand-written in the chart. He testified that he suspected Patient would get worse before she got better, but there was no guarantee that she would. The plan was to monitor Patient, escalate therapy as needed, give a diuretic and Labetalol (beta blocker), blood pressure medication, and indicate to the ICU that Patient **may** need intubation at some point. Dr. Ellis contends that his plan and actions were appropriate, met the standard of care, and did not cause Patient any injury.

- 13 -

The alternate method instruction is supported by the evidence. Dr. Gunnerson testified that Patient needed an "alternative" of (1) non-invasive positive pressure ventilation or (2) intubation, but (3) admit to ICU and intubate when necessary was not appropriate. Dr. Ellis testified that he considered those alternatives and chose option 3, admit to the ICU for close observation because Patient did not need other interventions at that time. The evidence of record reveals that the three courses of action proposed by the physicians' testimony at trial represent alternate methods of caring for and treating Patient. Accordingly, the trial court properly determined that the instruction did apply because "there were choices" Dr. Ellis could make, and that charging alternate methods would not prejudice either party.

## Hindsight Instruction

The trial court instructed the jury on hindsight:

> In a healthcare liability action, a defendant cannot be found negligent on the basis of an assessment of a patient's condition which only later or in hindsight proved to be incorrect, as long as the initial assessment was made in accordance with the then-reasonable standards of medical care.

The trial court further instructed:

> Now the foreseeability requirement does not require the person guilty of negligence to foresee the exact manner in which the injury takes place or how the person would be injured. It is enough that the person guilty of negligence could foresee or through the use of reasonable care should have foreseen that the general manner in which injury would occur.

As to Dr. Ellis's knowledge "at the time of the injury," Husband contends that the trial court's charge instructing the jury to focus on what the physician knew would happen at the time was inappropriately fact specific. He argues that the hindsight instruction as given "require[d] Dr. Ellis to foresee the exact outcome in order to be guilty of negligence." According to Husband, in *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn. 1991), the Tennessee Supreme Court made clear that the tortfeasor need not foresee the exact manner of harm, and it is sufficient if harm in the abstract could be anticipated. *Id.* at 775 ("The foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred.").

In healthcare liability actions, the standard of care against which the actions of a defendant doctor are measured is "[t]he recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in

- 14 -

the community in which the defendant practices or in a similar community *at the time the alleged injury or wrongful action occurred.*" Tenn. Code Ann. §29-26-115(a)(1) (emphasis added). Indeed, foreseeability must be determined as of the time the acts or omissions claimed to be negligent. *Doe v. Linder Const. Co., Inc.*, 845 S.W.2d 173, 178 (Tenn. 1992). The actor's conduct must be judged in the light of the possibilities apparent to him at the time, and not by looking backward "with the wisdom born of the event." *Id.* (citing Prosser and Keeton, The Law of Torts § 31 at 170 (1984)). Dr. Gunnerson acknowledged that knowing Patient ultimately passed away was a fact he considered in formulating his opinions regarding the proposed courses of action. Dr. Rice likewise testified that he only knew Patient was going to need intubation because that is exactly how it played out in this case. Thus, the hindsight instruction is supported by the evidence and was necessary to ensure that the jury judged Dr. Ellis by the appropriate standard.

A jury charge will not be invalidated so long as it fairly defines the legal issues involved in the case and does not mislead the jury. *Hunter v. Burke*, 958 S.W.2d 751, 756 (Tenn. Ct. App. 1997) (citations omitted). A jury verdict will not be reversed unless it is shown that the failure to give the instruction or the manner in which an instruction was given more likely than not affected the verdict. *Bara*, 104 S.W.3d at 3. Finding no reversible error in this record, we affirm the trial court's rulings.

## Award of Discretionary Costs to Dr. Ellis

Rule 54.04(2) of the Tennessee Rules of Civil Procedure permits prevailing parties in civil actions to recover "discretionary costs." *Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178, 214 (Tenn. Ct. App. 2008). Awards of discretionary costs are decisions that address themselves to the trial court's sound discretion. *Id.* at 215 (citations omitted). The abuse of discretion standard does not allow an appellate court to substitute its judgment for that of the trial court. *Wright ex rel. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). Nevertheless, discretionary decisions require "a conscientious judgment, consistent with the facts, that takes into account the applicable law." *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015) (citations omitted).

Dr. Ellis timely moved for $45,280.70 in discretionary costs. Husband responded that select costs ($21,406.84) may not be recoverable (leaving an inference that $23,873.86 was recoverable). According to Husband, one of the recognized factors on recoverability of discretionary costs in Tennessee case law is whether a party has engaged in litigation conduct that warrants depriving it of the discretionary costs to which it might otherwise be entitled. *Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 14, 35-36 (Tenn. Ct. App. 2002). Husband argues the fact that Dr. Ellis initially sought some nonrecoverable costs "is litigation conduct that should have been completely disqualifying" and should have resulted in a "denial of his efforts to recover discretionary costs entirely[.]"

In response, Dr. Ellis filed a modified request for discretionary costs that withdrew

or reduced select costs to $32,031.66. The trial court thereafter awarded Dr. Ellis $16,015.83 in discretionary costs. As the trial court properly exercised its discretion, we will not second-guess it. *Woodlawn Mem'l Park, Inc. v. Keith*, 70 S.W.3d 691, 698 (Tenn. 2002).

## V. CONCLUSION

For the foregoing reasons, we affirm the trial court in all respects. This matter is remanded with the costs of this appeal taxed to the appellant, Kerry Davis.

_____
JOHN W. MCCLARTY, JUDGE